NEW BRUNSWICK & CANADA R. CO. *v.* E. S. WHEELER & CO.

*(Circuit Court, D. Connecticut. June 8, 1882.)*

1. CONTRACT EXECUTORY—PERFORMANCE—REPUDIATION.

In an action on a contract to deliver goods, when the plaintiff performs, the defendant having continuously called for execution of the contract, it is not competent for the latter to refuse to accept performance; but if, upon notice by the promisor of an executory contract that he will not perform, the promisee accepts the situation and treats the contract as at an end, the promisor cannot afterwards, by changing his mind, compel the promisee to accept performance.

2. SAME—RIGHTS OF PROMISEE UNDER.

The promisee may treat the notice of intention as inoperative and await the time when the contract is to be executed, and then hold the other party responsible for the consequences of non-performance, remaining subject to all

his own obligations under it, or he may treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action on a breach of it for such damages as would have arisen from the non-performance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss.

*John W. Alling* and *Chas. R. Ingersoll,* for plaintiff.

*John S. Beach* and *Edward J. Phelps,* for defendants.

SHIPMAN, D. J. This is an action at law which was tried by the court, the parties having waived a jury trial by the written stipulation which is a part of the record. The facts in the case which are found to be true, the testimony which was objected to, the rulings of the court upon said objections, and the exceptions to said rulings, are as follows:

The averments of the complaint in regard to the citizenship, residence, incorporation, and partnership of the respective parties are true.

The New Brunswick & Canada Railroad Company is a corporation which owns and manages a railroad running from St. Stephens, in New Brunswick, to Holton, in the state of Maine, a distance of about 100 miles. At the time of the transactions hereinafter mentioned the corporation had eight directors, who owned nearly all of the capital stock of the company. At the organization of the company, a few years ago, there were but eight owners. The business of said directors was transacted very often without the formality of votes, but by verbal instructions to the president, and more after the manner of a partnership than of a corporation.

In 1878 the directors commenced to relay the road with new steel rails, and 1,000 tons were bought for that purpose. On July 24, 1879, the directors passed the following vote: "Resolved, that the president be authorized to purchase 2,000 tons of steel rails, if he deems it advisable to do so."

Negotiations for this purpose were thereafter commenced, which resulted in a contract, executed about Feburary 6, or 7, 1880, with an English firm for the purchase of that amount of steel rails. They were to arrive some time thereafter. As reliance was placed upon the money to be obtained from the sale of the old rails for the payment of the new, the directors of the corporation, in conversations and by verbal instructions given from time to time before the completion of said contract, both at directors' meetings and at occasional interviews elsewhere, but not by vote passed at any meeting, verbally authorized and instructed their president to sell the old rails belonging to said company and then upon the road-bed, and gave him full authority to do whatever was necessary for that purpose. When Mr. James Murchie, the vice-president of said company, was about to leave St. Stephens for New York and the eastern cities in January, 1880, upon business of his own, the president gave him express instructions to sell said old rails, the approximate weight of which was well understood, for 75 tons of old rails would be taken up by the laying 100 tons of new rails, and in pursuance of said instructions said Murchie, as vice-president of the company, entered at New Haven on January

31, 1880, into the written contract with the defendants for the sale of 1,000 tons, and also for the sale of 200 to 600 tons, which contract is contained in plaintiff's Exhibits 1 and 2 hereto annexed.(*a*)

On February 16, 1880, at a meeting of the directors of the plaintiff corporation, the following votes were passed:

"Resolved, that the contract made by Mr. Murchie with Messrs. E. S. Wheeler & Co., of New Haven, be agreed to; a memorandum to this effect to be furnished to Mr. Murchie, to be forwarded to Messrs. Wheeler & Co.

[After discussion upon another subject:]

"Resolved, that the following sale of old rails made by Mr. James Murchie to Messrs. E. S. Wheeler & Co. be confirmed:

"Sold E. S. Wheeler & Co. 1,000 tons of old rails for delivery in New York or New Haven, at their option, before August the 1st next, at thirty dollars ($30) per ton of 2,000 lbs., the duty to be paid by Wheeler & Co., and also 200 to 600 for delivery in New York or New Haven, between August 1st and October 1st, at twenty-eight dollars ($28) per ton of 2,000 lbs., the duty to be paid by Wheeler & Co.

"In each case, cash against invoice, bill of lading; insurance policy in satisfactory company."

On February 17, 1880, Mr. Murchie sent the defendants the letter hereto annexed, marked Defendants' Exhibit B.(*b*)  On February 28, 1880, the defendants replied to said letter of Murchie, and sent to him, as vice-president, the letter hereto annexed, marked Defendants' Exhibit D.,(*c*) which letter was duly received, but to which no reply was made. No other communication, verbal or written, passed between the plaintiff and defendants until about June 10, 1880, when Mr. Murchie called upon the defendants and asked them whether they would have those rails delivered in New Haven or New York, and said that the defendant was ready to deliver them, and that the tons were to be 2,240 pounds each.

The defendants declined to receive any rails upon the ground that the plaintiff had repudiated the contract of January 31st, or that it had ceased to exist by the plaintiff's act. The plaintiff thereupon sent the defendants the letter of June 14, 1880, hereto annexed and marked Defendants' Exhibit E,(*d*) to which the plaintiff replied by letter of June 15, 1880, hereto annexed and marked Defendants' Exhibit F.(*e*)

On June 30, 1880, the plaintiff tendered in fact, under the contract of January 31, 1880, to the defendants a cargo of old iron rails of about 65 tons, of 2,240 pounds to the ton, at the city of New Haven, and the defendants declined to receive the same, or to say where they should be delivered, whether at New Haven or New York, or to give any instructions whatever on the subject.

The plaintiff, on August 10, 1880, sent to the defendant the letter of that date, hereto annexed and marked Plaintiff's Exhibit 3,(*f*) to which the defendant replied by letter of August 21, 1880, hereto annexed and marked Plaintiff's Exhibit 4.(*g*) All the letters hereinbefore mentioned were duly and seasonably received by the respective parties to whom they were sent.

(*a*) See *post*, 384.  (*c*) Id. 385.  (*e*) Id.  (*g*) Id. 387.
(*b*) Id.  (*d*) Id. 386.  (*f*) Id.

The defendants never received, but always, after June 10, 1880, refused to receive, any of said 1,000 tons, or of said 600 tons, either at the city of New York or at New Haven, although the same were duly and properly tendered to them on June 10th, June 14th, June 30th, and August 10th. The plaintiff had at said respective dates, and before August 1, 1880, 1,000 tons of rails for delivery under the contract of January 31, 1880, and also had 600 other tons of rails between August 1 and October 1, 1880, for delivery under said contract, and was, at said respective dates upon which tender was made, able, ready, willing, and anxious to deliver said iron, and to comply with the contract of January 31st by the delivery of 1,000 and 600 tons, of 2,240 pounds each.

It was agreed (subject to the plaintiff's right of objection to the admission of evidence to prove the same, to which evidence and to the proof of which fact the plaintiff duly and seasonably objected upon the ground that the statutes hereinafter quoted show the meaning of the word "ton," but the court admitted the same, to which ruling the plaintiff duly and seasonably objected) that a ton of iron rails or other scrap iron, when contracted for, or bought and sold in the markets of the cities of New York and of New Haven, by the uniform usage or custom of those markets, means, and on January 31, 1880, meant, a ton of 2,240 pounds, unless the term of the contract evidenced a different meaning upon its face.

The statute of the state of Connecticut, in force on January 31, 1880, and still in force, provides as follows: "In the sale of articles by avoirdupois weight, 100 pounds shall constitute a hundred weight, and 2,000 pounds shall constitute a ton; and the aliquot parts of a hundred weight and of a ton shall be reckoned accordingly." By the statutes of New York, Maine, and the dominion of Canada, in force upon January 31, 1880, and still in force, 2,000 pounds constitute a ton. The parliament of the dominion of Canada has control of weights and measures throughout the dominion, and its statute provides that every contract made in the dominion for any merchandise agreed for by weight or measure shall be deemed to be made and had according to one of the dominion weights or measures, ascertained by said act, and if not so made, according to the metric system.

On January 31, 1880, and when the contract of that date was entered into by and between the said Murchie, acting in behalf of and as the agent of said company, and E. S. Wheeler, one of the defendants, and acting for said firm, each of said parties contracted for the sale and purchase of gross tons, in accordance with said custom, and each understood that he was contracting for tons of the customary weight,—that is, of 2,240 pounds each,—and each knew that the word "tons," as used in said contract, meant in his mind tons of 2,240 pounds each, and there was no misunderstanding between said persons as to the true intent and meaning of said contract.

The plaintiff duly and seasonably objected to any evidence in regard to custom or usage, or the understanding of Mr. Murchie as to the meaning of the word "ton," but the same was admitted, and to said ruling the plaintiff duly and seasonably excepted.

It was agreed that the list hereto annexed and marked Plaintiff's Exhibit

No. 6* correctly shows the market price per ton of old iron rails in the markets of the cities of New York and New Haven, at the dates respectively as given, and that a ton of such rails or other scrap iron, when quoted for the market price in said markets, means a ton of 2,240 pounds, the duty on such iron being eight dollars per ton of 2,240 pounds, and included in said market price.

The damage to the plaintiff by reason of the refusal of the defendant to accept said 1,000 tons was the sum of $11,000; and the damage by reason of their refusal to accept said 600 tons was the sum of $5,400.

The defendants' counsel asked Mr. E. S. Wheeler, the only defendant who made the contract or had any knowledge of the business, the following questions, to each one of which the witness gave the answers respectively written in response to the respective questions. To each one of said questions, and to each one of said answers, the plaintiff objected upon the ground that it was immaterial. The question and answer No. 2 was admitted to contradict a single statement in the testimony of Mr. Murchie. No. 8 was admitted, as was also the other testimony in regard to the meaning of the word "tons" as used in said contract, because a decision upon the question of admissibility became immaterial in view of the plaintiff's conduct in tendering gross tons, and to avoid dispute agreeing to the defendants' construction of the contract. No. 9 was excluded. The remaining questions and answers were considered to be properly in evidence for the purpose of enabling the court to ascertain the effect of the silence of the plaintiff after the letter of February 28th upon the defendants' previous position in regard to the contract, the previous position having been that of affirmance. To the rulings against the objection of the plaintiff, and to the ruling in favor of the objection of the plaintiff, the defendants duly and seasonably excepted.

*No.* 1. Beween January 21, and February 17, 1880, did you have any opportunities of disposing of the 1,000 tons of rails about which you had contracted with the plaintiff? *Ans. No.* 1. We had repeated opportunities. Mr. Murchie called on Saturday, January 31st, and on Monday we could have sold the rails for that future delivery at $4 per ton profit, and on Tuesday at $5 per ton profit.

*No.* 2. Do you know of any manufactory in New Haven which uses old iron rails? *Ans. No.* 2. No.

*No.* 3. State the object for which you bought these rails. *Ans. No.* 3. I bought these rails to sell, not to manufacture.

*No.* 4. Had you other opportunities to sell these rails? *Ans. No.* 4. We had other opportunities to sell, but these offers were firm offers, made by responsible parties.

*No.* 5. Why did you not take these offers? *Ans. No.* 5. Because Mr. Murchie had come to us a stranger, representing a company of which we had never before heard, bringing no letter of introduction, and showing by his conversation that he was not familiar with old rails, and because he had sold them at much less than the market price of the day. I had grave suspicions whether we should get the property, and the amount involved was so large as to make it prudent for us to investigate the character and responsibility of the sellers. That investigation we could not make without some delay.

*No.* 6. After the letter of February 17th did you make any attempt to sell the iron? *Ans. No.* 6. No.

* See *post*, page 387.

*No.* 7. Could you have sold it at a profit at that time? *Ans. No.* 7. We could have sold at a large profit.

*No.* 8. State in regard to the truth of the statements made in your letter of February 28th. *Ans. No.* 8. The statements made in our letter of February 28th are true. It correctly states our understanding of the contract.

*No.* 9. When did you first hear of the statute of Connecticut in regard to the meaning of the word "ton?" *Ans. No.* 9. I first heard of the statute of Connecticut about a month ago, from Mr. Beach.

The statutes of New Brunswick, (Consolidated Statutes, 750,) provide that "the contract of the agent of any corporation within the scope of his authority and the acts of a corporation shall be valid, though not authenticated by their seal."

The plaintiff did not intend by its votes February 16th or by the letter of February 17th to repudiate or abandon the contract of January 31st. It did attempt by said votes to draw from the defendants a modification of said contract. The defendants did not, by word or act, prior to June 10th, change their previous position in regard to the contract, which position is stated in their letter of February 28th.

The conclusion to which I have come from the foregoing facts are as follows:

1. That the president of the company was fully authorized to take all steps necessary to sell the iron rails, although the authority was not conferred by vote of stockholders or directors; that this power to sell was not limited to his personal action, but that he was also fully authorized to employ substitutes or agents, and that James Murchie was duly authorized to make the contract of January 31, 1880.

2. That the questions whether parol evidence was admissible to explain the meaning of the word "ton," as used in the contract of January 31, 1880, in view of the statutes hereinbefore specified, or whether parol evidence was admissible to alter or vary the meaning of the word from that given in said statutes, or either of them, are immaterial, inasmuch as the plaintiff, by its conduct in tendering tons of 2,240 pounds each, and by its letters of June 14th and August 10th, agreed, for the purpose of avoiding dispute, to the defendants' construction of the contract, and, in fact, admitted that the contract should be taken to mean gross tons.

3. Neither the votes of February 16, nor the letter of Mr. Murchie of February 17, 1880, can fairly be considered a repudiation of the contract, or an attempt to abandon it. The directors did not intend or want to repudiate or abandon, and no confirmation of the contract was needed, but they desired, by an apparent misunderstanding of the terms of the contract, to see whether the defendants would consent to such a modification of it as was suggested by the addition of the words "of 2,000 pounds." But if these votes were a repudiation,

the defendants, by their letter of February 28th, insisted upon the execution of the contract according to its true intent; and if it was then permitted to them to treat the contract as at an end by reason of the disingenuous conduct of the plaintiff's directors, they refused to do so, and continuously held the plaintiff to strict performance. When the plaintiff performs, the defendant having continuously called for execution of the contract, it is not competent for him to refuse to accept performance. But if, upon notice by the promisor of an executory contract that he will not perform, the promisee accepts the situation, and treats the contract as at an end, the promisor cannot afterwards, by changing his mind, compel the promisee to accept performance.

4. The silence of the plaintiff, after the letter of February 28th, raises a more doubtful question; but, I think, assuming that this silence amounted to a notice of non-intention on its part to complete the contract for gross tons, that the defendants, by their conduct, treated such notice of non-intention as inoperative, and insisted upon performance, and cannot, when the plaintiff is ready and willing to perform, refuse to accept its tender. The natural effect of the plaintiff's silence, after the letter of February 28th, was to create great uncertainty, and to cause consequent annoyance and pecuniary loss to the defendants. Such pecuniary loss is not proved here, for I do not regard Mr. Wheeler's answers to questions 6 and 7 as proving any loss to which he was subjected by the silence of the plaintiff, but cases may easily arise where such silence would be very injurious to the other contracting party, and would be very censurable. Assuming that the defendants would have been justified in regarding this silence as a continued affirmation of the construction which was given in the vote of the directors to the contract, and as a wrongful putting an end to it, they were silent on their part, and continued to stand on the letter of February 28th, demanding performance. When the plaintiff performs, if the defendant has not declared by his words or conduct, in regard to the subject-matter of the contract, that it is at an end, but has kept it alive and demanded fulfilment, he is bound to accept of performance. The law on the subject is stated in a recent English case by Chief Justice Cockburn as follows:

"The law with reference to a contract to be performed at a future time, when the party bound to performance announces prior to the time his intention not to perform it, as established by the cases of *Hochster* v. *Delatour* and the *Danube & Blade Sea Co.* v. *Xenos* on the one hand, and *Avery* v. *Bowden*, *Read* v. *Hoskins*, and *Barwick* v. *Buba* on the other, may be thus stated: The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the

other party responsible for all the consequences of non-performance; but in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstances which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action on a breach of it, and in such action he will be entitled to such damages as would have arisen from the non-performance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss."

5. The plaintiff is entitled to judgment for the sum of $16,400, with interest at 6 per cent. upon $11,000 from August 1, 1880, and interest upon $5,400 from October 1, 1880.

---

### PLAINTIFF'S EXHIBIT No. 1.

NEW HAVEN, January 31, 1880.

*James Murchie, Esq., Vice-President New Brunswick & Canada Railroad—*
DEAR SIR: We have this day bought of you, as representative of the New Brunswick & Canada Railroad Company, 1,000 tons old rails, for delivery in New York or New Haven, (at our option,) at $30, without duty, and delivery to be before August 1st, and also two (2) to six hundred tons for delivery in New York and New Haven, between August 1st and October 1st, at $28. without duty. Terms, in each case, cash, against invoice, B. L., and insurance policy in satisfactory company.

    Very respectfully,             E. S. WHEELER & Co.

### PLAINTIFF'S EXHIBIT No. 2.

NEW HAVEN, January 31, 1880.

*E. S. Wheeler & Co., New Haven:* We hereby accept your order of this date, and will deliver rails at price and on terms named.

    Respectfully,             NEW BRUNSWICK & CANADA R. R. Co.
                                 JAMES MURCHIE, Vice-President.

### DEFENDANTS' EXHIBIT B.

ST. STEPHENS, February 17, 1880.

*Messrs. E. S. Wheeler & Co., New Haven—*DEAR SIRS: I herewith enclose a copy of resolution passed at our meeting of directors yesterday. This confirmed the sale "made by me to you," by the company, which was done on my arrival home. The car wheels and chains that we had on hand were sold before I came home; we will have a large quantity by the time we ship our rails. Please acknowledge the above.

    Yours, truly,             JAMES MURCHIE.

## NEW BRUNSWICK & CANADA RAILROAD COMPANY.

*Minute of a Resolution Passed at a Directors' Meeting, February* 16, 1880.

Resolved, that the following sale of old rails, made by Mr. James Murchie to Messrs. E. S. Wheeler & Co., New Haven, Connecticut, be confirmed:

"Sold Messrs. E. S. Wheeler & Co. 1,000 tons of old rails, for delivery in New York or New Haven, at their option, before August the 1st next, at thirty dollars ($30) per ton of 2,000 pounds, the duty to be paid by Wheeler & Co.; and also 200 to 600 tons for delivery in New York or New Haven between August 1st and October 1st, at twenty-eight ($28) per ton of 2,000 pounds, the duty to be paid by Wheeler & Co. In each case, cash, against invoice, bill of lading. Insurance policy in satisfactory company.

(True copy.)                              "F. H. TODD, President."

## DEFENDANTS' EXHIBIT D.

NEW HAVEN, February 28, 1880.

*James Murchie, Esq., Vice-President New Brunswick & Canada Railroad Company, St. Stephens, Canada*—DEAR SIR: We received duly your favor of the seventeenth instant, enclosing what purports to be a certified copy of a resolution adopted by the directors of the New Brunswick & Canada Railroad Company in reference to the sale of old rails made by you, on behalf of that company, to us, on the thirty-first ultimo. We assume that this resolution was passed merely as matter of form, and a copy has been sent us for our information solely, as no mention was made at the time of the negotiations that you acted subject to any approval by your company. We understood then, and understand now, that the sale made at that time on behalf of your company was an absolute and final unconditional sale. We do not understand further that this resolution was forwarded to us with the view of in any way modifying that sale in any of its terms.

Furthermore, we understood at the time, and now understand, that the number of pounds in each ton of this contract, there being no contrary specification when the contract was made, was not 2,000, but 2,240. Old rails, like other scrap and like pig iron, are bought and sold by the gross ton, not only in this market, but in every foreign market. The custom of the trade fixing 2,240 as the standard number of pounds in a ton of old rails is universal, and can be excluded from operating on contracts only by distinct conditions fixing some other quantity. No such conditions were mentioned in the contract of your company with us, and we look, therefore, for the delivery of the rails within the dates named in the contract of your company, and in "gross," not net tons. We make no doubt but that your understanding of that contract is in accord with ours, and that in so far as this resolution fixes a different number of pounds for each ton, that it so fixes them by an oversight on the part of the directors. We hope to hear from you at your early convenience.

Very truly yours,

[Signed]                                E. S. WHEELER.

## DEFENDANTS' EXHIBIT E.

69 CHURCH STREET, NEW HAVEN, CONN., June 14, 1880.

*Messrs. E. S. Wheeler & Co.*—DEAR SIRS: We now have ready for delivery the 1,000 tons of old rails sold you January 31, 1880, by contract of sale of that date, made by you and James Murchie, as representing the New Brunswick & Canada Railroad Company. By the terms of that contract the 1,000 tons are to be delivered before August 1st next in New York or New Haven, at your option.

You will please inform us at your early convenience at which of those ports the rails shall be delivered.

In your letter to James Murchie, as vice-president of our company, of February 28th, last, you construe the contract as meaning that the ton of rails specified in that contract is 2,240 pounds, or the gross ton. Now, without waiving any of our rights under that contract, but to avoid dispute, we tender you the delivery of the thousand tons, at gross weight of 2,240 pounds to the ton, and ask your determination whether the delivery shall be made at New Haven or New York.

NEW BRUNSWICK & CANADA RAILROAD CO.

By F. A. PIKE, Special Agent.

## DEFENDANTS' EXHIBIT F.

(Copy.)                                        NEW HAVEN, June 15, 1880.

*New Brunswick & Canada Railroad Co.*—GENTLEMEN: Your letter of yesterday, advising that you are ready to deliver to us 1,000 tons of old rails, and asking us to designate a port of delivery, is received. As we do not recognize the existence of any such contract of sale as your letter contemplates, we have no instructions to offer upon the subject. It is true that we tried last winter to buy of you 1,000 gross tons of old rails, at a price which would have netted us a large profit; but this we had to lose, as your company insisted they were selling net tons, and no contract resulted upon which we could base our sales.                   Very truly yours,

E. S. WHEELER & CO.

## PLAINTIFF'S EXHIBIT NO. 3.

69 CHURCH STREET, NEW HAVEN, CONN., August 10, 1880.

*Messrs. E. S. Wheeler & Co.*—DEAR SIRS: By the terms of your contract with the New Brunswick & Canada Railroad Company of the date of January 31, 1880, you bought of the company 200 to 600 tons of old rails, to be delivered to you in New York or New Haven between August 1 and October 1, 1880. We now have 600 tons of such old rails ready for delivery to you, and respectfully inquire at which port, New York or New Haven, you wish the delivery to be made.

In your letter to James Murchie, as vice-president of said railroad company, of February 28th last, you construe the contract as meaning that the ton of rails specified in that contract is 2,240 pounds, or the gross ton. Now, without waiving any of our rights under that contract, but to avoid dispute,

we tender you the delivery of the 600 tons at gross weight of 2,240 pounds to the ton, and ask your determination whether the delivery shall be made in New Haven or in New York, or whether, in view of your action concerning the 1,000 tons mentioned in the same contract, a delivery at all shall be made.

Respectfully yours,.

THE NEW BRUNSWICK & CANADA RAILROAD COMPANY.

By JOHN W. ALLING, Attorney.

### PLAINTIFF'S EXHIBIT NO. 4.

NEW HAVEN, August 21, 1880.

*The New Brunswick & Canada Railway Company*—GENTLEMEN: We have your favor of the 10th inst., wherein you ask shipping instructions for certain old rails under the terms of an alleged contract with us. Upon the fifteenth of June last, in answer to a similar request from you, we stated that we did not recognize the existence of any such contract and that we therefore had no instructions to offer. Our views regarding this matter have undergone no change since our last letter on this subject, and we do not see that we can give you any further directions regarding the disposition of the rails named by you.

Truly yours, E. S. WHEELER & Co.

### PLAINTIFF'S EXHIBIT NO. 6.

NEW BRUNSWICK & CANADA RAILROAD COMPANY *vs.* E. S. WHEELER & Co.

(*United States Circuit Court, District of Connecticut.* April Term, 1882.)

In the above case it is agreed that the following list correctly shows the market price per ton of old iron rails in the markets of the cities of New York and of New Haven, at the dates respectively as given, and that a ton of such rails or other scrap iron, when quoted for the market price in said markets, means a ton of 2,240 pounds, the duty on such iron being eight dollars per ton of 2,240 pounds, and included in said market price.

It is also agreed (subject to the plaintiff's right of objection to the admission of evidence to prove the fact) that a ton of said rails, or other scrap iron, when contracted for, or bought or sold in said market by the uniform usage or custom of those markets, means, and at the date of said alleged contract in controversy meant, a ton of 2,240 pounds, unless the terms of the contract evidenced a different meaning upon its face.

PLAINTIFFS,

BY INGERSOLL & ALLING.

Defendants reserving right to offer evidence consistent with stipulation.

BY JOHN S. BEACH.

PRICE OF OLD T RAILS IN NEW YORK AS REPORTED IN THE NEW YORK COMMERCIAL BULLETIN.

Feby. 4, '80. At 43 and 43.50.

" 7, '80. 42.50 and 43.

" 11, '80. 42 and 43.

" 14, '80. 42 and 42.50.

" 18, '80. 42.50.

" 21, '80. Sales of 3,000 tons 42, to arrive; 3,000 tons do. at a shade under 42.50.

" 25, '80. 42.50; steady.

" 28, '80. 42.00; best bids 50c. to 1.00 under; we learn of 1,000 at 41.50, spot.

March 3, '80. 41.00 and 42.00.

" 10, '80. 40 to 41.

" 13, '80. As low as 40.00 for shipt., while up to 40.00 for spot.

" 17, '80. 117½ shillings c f i; we learned of 3,000 tons at 39.00 and 40.00.

" 20, '80. 38.00 to 39.00.

" 24, '80. 37.00 and 38.00.

" 27, '80. 37.50 to 38.50.

" 31, '80. 37.00 to 38.00.

April 3, '80. About 37.00 and 38.00.

" 7, '80. About 35.50 to 36.00 would be readily accepted.

" 10, '80. Not over 35.00; cable late this afternoon 105½ shillings.

" 14, '80. 34.00 to 35.00.

" 21, '80. 34.00 and 35.00 spot.

" 24, '80. 3,000 tons sold at 32.00 and 33.00; lot of 250 tons at 30.00 to arrive.

" 28, '80. About 30.00; holders' views are 1.00@2.00 over that; we learned of 2,500 tons sold 29 to 30 here.

May 1, '80. 28.50@29.00; 1,800 tons at 28.00@29.00 here.

" 19, '80. 25.00@26.00 to be full outside quotations.

" 22, '80. 25.00@26.00.

" 26, '80. 27.00 to 28.00 bottom figures; we hear of 4,000 tons at 26.00 in store.

May 29, '80. 26.00 general price.

June 2, '80. About 26.00 for spot parcels.

" 9, '80. 24 to 24.50.

" 12, '80. 24.50@25.00, spot lots.

" 16, '80. 24.50@25.00, but the bulk of the supply held for 26.00

" 19, '80. 24.50 to 25.00.

" 23, '80. 23.50@24.50.

" 26, '80. 24.00@24.50.

" 30, '80. We hear of T offered at 23.50.

July 3, '80. 24.00@24.50.

" 7, '80. 23.50 to 24.50.

" 10, '80. 24.00@25.00 fair price.

" 14, '80. About 24.50.

" 17, '80. Bids of 26.00.

" 21, '80. Holders naming 26.50.

" 24, '80. It is doubtful if less than 26.00 would be accepted; as a rule holders ask 28.00.

" 28, '80. About 27.00; heard of 100 tons at 28.00 ex store.

" 31, '80. 27.00 and 27.50.

Aug. 4, '80. 28.00@29.00.

" 11, '80. About 27.00.

" 18, '80. About 27.50@28.00.

" 28, '80. About 27.00.

Sept. 1, '80. About 27.00; holders' views about 1.00 more.

" 4, '80. Stock offered about 27.00.

" 8, '80. About 300 tons at 27.00, del'd Phil.

" 11, '80. Some lots at 26.00, but more generally asked.

" 15, '80. 26.00@27.00.

" 18, '80. About 26.00.

" 25, '80. 27.00 full outside quotation.

" 29, '80. There are buyers at 26.00 at auction; 2,-669 tons sold at 26.25, taken by Cleveland Roll. Mill.

Oct. 2, '80. $26 to 26.50; 1,000 tons sold at $25.75.