KERSLAKE, Respondent, vs. McINNIS and others, Appellants.

113 659
e116 ⁿ272

*February 20—April 1, 1902.*

*Logs and timber: Contracts, entire or separate: Penalty: Liquidated damages: Consideration: Evidence: Court and jury: Instructions to jury: Appeal: Exceptions: Questions reviewed: Pleading: Reply: Inconsistent defenses: Prejudicial error.*

1. A contract for the cutting, floating, and booming of all the logs on a certain tract of land, which provides for payments in instalments as the work progresses, with a reservation of one

third to be paid when the entire amount was boomed, is not an entire contract in the sense that full performance must be shown in order to entitle the contractor to recover anything; but he, having performed part, may recover for such part, although he shows no legal excuse for failure to perform the whole, subject, however, to a deduction for actual damages suffered on account of any breach of the contract.

2. In such case, the one third reserved until full performance is: a penalty, and not liquidated damages.

3. A land owner contracted with A. to cut, float, and boom logs from a certain tract of land,—the removal to be done in the manner directed by the owner. Thereafter B. entered into a contract with A., whereby B. was to remove and boom the logs from a portion of the tract, but B. was not bound by his contract to accomplish that result in any particular way. B. had banked part of the logs in a creek, intending to float them out, when the land owner refused to permit such operation. *Held*, that a modification of the contract relieving B. from the duty of cutting and floating all the logs, and requiring him to turn in with his whole force and haul the logs out of the creek at a certain rate per M., was supported by a sufficient consideration.

4. A lumberman, required by his contract to cut, float, and boom all logs from a specified tract during the then logging season, quit work between the 12th and 20th day of March, the weather being soft, and the water in the creek, where they were necessarily hauling the logs, having raised from two to three feet. The snow was nearly gone, and there was no snow where the logs were loaded. Thereafter the weather turned cold, and there was from ten to twelve days of good weather for hauling. *Held*, under the conditions shown, and considering the time of the year, that the evidence was sufficient to sustain a finding that the work had progressed as long as the judgment of a reasonably prudent man, engaged in such business, would have dictated.

5. In such case the evidence would not support a verdict that plaintiff was negligent in breaking camp when he did.

6. The question of the correctness of instructions to the jury, which were refused, is not open to consideration on appeal, where no exceptions are taken to the ruling until after the verdict.

7. Under sec. 2657, Stats. 1898, providing, with certain restrictions, that the defendant may set forth, by answer, as many defenses, etc., as he may have, plaintiff, in his reply to defendant's

counterclaim, may set up defenses, based on inconsistent legal theories.

8. A reply to a counterclaim setting up inconsistent defenses, if erroneous, does not affect the determination of material issues, where there was but one defense relied upon and submitted to the jury, and no objection was made to the form of the pleading in the trial court.

9. Where evidence is offered and rejected, but the ruling did not preclude the introduction of other evidence, it is not prejudicial error, after argument to the jury had begun, to permit the withdrawal of the objection and the introduction of such evidence at that time.

BARDEEN, J., dissents.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. Affirmed.

This is an action to recover for the cutting, hauling, and booming of logs. The complaint contains two causes of action; the first being to recover for cutting, setting afloat, and booming 1,001,000 feet of logs in the winter of 1899 and 1900 at an agreed price of $3 per M.; and, second, for hauling during the same winter 729,310 feet of logs from Bardon creek to a pond in the vicinity at an agreed price of twenty-five cents per M.; the whole amount claimed by both causes of action being $750.23. The defendants are copartners, and by their answer allege that in October, 1899, they made a contract with the Red Cliff Lumber Company to cut, haul, and bank on the shore of Lake Superior all white pine timber in certain lands in Douglas county for $3,50 per M., and that they afterwards made a written contract with the plaintiff by which the plaintiff was to cut, haul, and deliver in Lake Superior, set afloat, and boom, during the fall and winter of 1899 and 1900, all of the white pine timber upon section 33, said section being a part of the lands covered by the defendant's contracts with the lumber company; that the plaintiff commenced the performance of his contract, and did prior to the commencement of this action actually cut, set afloat, and boom in Lake Superior 1,001,000 feet of logs,

except that the plaintiff dumped about 50,000 feet thereof
in a certain creek on said land, where they remained and be-
came wholly worthless; that the defendants have paid to the
plaintiff $2,835.49 upon the contract; that said contract had
not been fully performed, in that the plaintiff did not de-
liver said 50,000 feet of logs, and, further, in that the plaint-
iff left uncut upon said lands 400,000 feet of timber. By
way of counterclaim the defendants claimed damages of the
plaintiff for not cutting said 400,000 feet of timber, and for
not delivering the 50,000 feet left in the creek; the total
amount of damages claimed being $600. The plaintiff re-
plied to these counterclaims, and alleged that by the contract
between the defendants and the Red Cliff Lumber Company
it was agreed that the cutting and delivery of logs was to be
under the control of the Red Cliff Lumber Company, and
was to be performed in the manner directed by it; that up to
the 20th of December, 1899, the plaintiff, under the direc-
tion of the Red Cliff Lumber Company, and with the con-
sent of the defendants, had cut and banked on the ice in
Bardon creek 729,310 feet of logs, and that on that day the
Red Cliff Lumber Company determined that the logs so
banked could not be run down the creek to Lake Superior,
and thereupon the plaintiff and defendants and the Red Cliff
Lumber Company mutually agreed that the logs so banked
should be hauled by the plaintiff to a certain pond near the
mouth of said creek, and that for such hauling the defendants
would pay the plaintiff twenty-five cents per M., and the Red
Cliff Lumber Company would pay him fifty cents per M.,
and it was further agreed that on account of this modification
of the contract the plaintiff should not be compelled to cut any
more standing timber; that the plaintiff had then cut
1,001,000 feet of timber, and that he hauled and delivered
all of the same into Lake Superior; that on account of such
new contract, and the modification of the old contract, it be-
came impossible for the plaintiff to cut and deliver during

that season the balance of the timber which was left standing on the section; that the timber so left standing did not amount to 400,000 feet, and that the same was left standing by express order of the Red Cliff Lumber Company; that the logs delivered in Bardon creek were so delivered by direction and with the consent of the defendants, and that the amount which was left in said creek did not exceed 10,000 feet; and that they were left by direction of the Red Cliff Lumber Company. Upon these pleadings the action came on for trial before the court and a jury. The contracts between the Red Cliff Lumber Company and the defendants and between the defendants and the plaintiff were both in writing, and not disputed. The contract between the Red Cliff Lumber Company and *McInnis & Sons* was dated September 25, 1899, and provided that *McInnis & Sons* should cut into merchantable saw logs about 25,000,000 feet of white pine, Norway, and cedar timber owned by the lumber company upon a number of sections in Douglas county; the same to be cut within three years after the making of the contract; but the timber upon a part of the tract, including section 33, was to be cut during the winter of 1899 and 1900. The contract provided that *McInnis & Sons* should "cut, haul, and bank the logs from the above-described land, and as directed by second party, and bank the same on the shore of Lake Superior, upon suitable banking grounds convenient to said timber." The contract also provided that *McInnis & Sons* should cut all logs "as directed by party of the second part or their representative." The contract between *McInnis & Sons* and the plaintiff was dated October 25, 1899, and provided that the plaintiff during the fall and winter of 1899 and 1900 should "cut into standard lengths, as directed by said first parties, and haul and deliver into Lake Superior, set afloat, and boom, all of the white pine timber that can be cut into merchantable saw logs, not less than seven inches in diameter at the small end," on section 33. The contract further provided for the mark-

ing and scaling of the logs, and by its terms the defendants agreed to pay to the plaintiff the sum of $3 per M. in installments,—$1 per M. on the first day of January, 1900, for all logs banked up to that time; $1 per M. on the first days of February, March, and April, 1900, for the logs banked during the preceding month; and the final $1 per M. when all of the logs should have been cut, set afloat, and boomed. The evidence shows that immediately after the execution of his contract the plaintiff brought an outfit of sleds and teams and a camp equipment to Superior, and commenced cutting timber under his contract. A small and somewhat rocky stream, called the "Bardon Creek," runs through section 33 in a northerly direction, and empties into Lake Superior at a point one half a mile or more from section 33. Much of the timber in the section grew upon the sloping banks of this stream. Near the mouth of the stream upon Lake Superior was a dam, the flowage of which constituted the pond spoken of in the pleadings and evidence. About 300,000 feet of the timber stood upon the N. E. ¼ of the N. E. ¼ of the section, and could be readily hauled to this point; but substantially all of the balance of the timber could not be readily drawn to the pond, unless it were drawn upon the ice formed on the creek, because it grew upon the steep banks of the stream, where it is very difficult to make a roadway. Prior to December 15, 1899, the plaintiff, in the performance of his contract, had cut from the N. E. ¼ of the N. E. ¼ nearly 300,000 feet of logs, and hauled the same to the pond; and he had also cut 729,310 feet, and banked the same upon the shores and the ice of Bardon creek, expecting to run the same down the creek in the spring. There was a conflict in the evidence as to whether logs could be run down Bardon creek successfully. The plaintiff assumed it to be a creek suitable to run logs, and he claims that after he commenced banking logs on the creek the defendants frequently saw his operations, and made no objections to them, and thus ac-

quiesced in this method of getting the logs to Lake Superior. About the 15th day of December, 1899, the Red Cliff Lumber Company wrote a letter to the defendants, forbidding the banking of any more logs in Bardon creek, and requiring that the logs already banked thereon should be hauled to the pond; and it is admitted that *John McInnis* took this letter to the plaintiff. Upon receipt of this letter the plaintiff went to the office of the Red Cliff Lumber Company, at Duluth, and conferred with the officers of the company about the matter; and he claims and has introduced testimony tending to show, that, after a number of conferences between himself and the company and the defendants, it was agreed that he should stop cutting timber, and should get to work with his whole outfit, hauling the logs which had been banked on the creek down to the pond upon the ice of the creek, and that for such work the lumber company would pay him fifty cents per M., and the defendants twenty-five cents per M., for all logs hauled; also that if, by reason of doing this hauling, he was unable to cut any more standing timber during the season, he was not to be required to do so; also that he was not to use dynamite to get logs out which were frozen in the ice, because of the danger of injury to the logs. The defendants deny having made any such contract. Whether this agreement was made or not, it appears that the plaintiff immediately went to work with his whole force, and commenced hauling the logs banked on the creek down to the pond; and he claims that he continued such work until he was obliged to break camp in the spring, and that he hauled all the banked logs to the pond, except about 10,000 feet which were frozen in the ice, and could not be gotten out without the use of dynamite. The defendants claim that about 50,000 feet were left in the ice. It was undisputed that about 400,000 feet of white pine timber were left standing upon the land. The defendants admitted upon the trial that, if the plaintiff was entitled to recover anything upon the second cause of action, he was entitled to recover

$182.50. It was admitted by the plaintiff that the defendants had paid in all upon the first contract the sum of $2,835.49. The court, of its own motion, submitted three questions to the jury, in addition to the general verdict, which questions, with their answers and the general verdict, are as follows:

"First. Was it agreed by and between the parties if the plaintiff would remove the logs, as testified, he should be relieved from cutting and getting in so much of the standing timber as he could not get in with his force and outfit during the logging season? Yes. Second. Was it agreed by and between the parties hereto that, if the plaintiff would remove the logs to the pond, the defendants would pay him therefor 25 cents per thousand? Yes. Third. How many thousand feet of logs were left in the creek? 22,600 feet. We, the jury in the above entitled action, find for the plaintiff, and assess his damages at the sum of two hundred eighty-two and 21-100 dollars ($282.21)."

Upon this verdict judgment was rendered for the plaintiff, and the defendants appeal.

For the appellants there was a brief by *Reed & Reed,* and oral argument by *Myron Reed.*

For the respondent there was a brief by *John Brennan,* attorney, and *L. K. Luse,* of counsel, and oral argument by *Mr. Luse.*

WINSLOW, J. Many errors are assigned, but they will not be taken up in detail. The general view which we take of the case renders specific treatment of each alleged error unnecessary. The case was really a simple one, though it seems to have developed some complications as the trial progressed, which, however, were more apparent than real.

The Red Cliff Lumber Company owned the timber in question. *McInnis & Sons* had contracted to cut and bank it as directed by the owner on the shore of Lake Superior during the winter of 1899 and 1900. Thereafter the plaintiff contracted with *McInnis & Sons* to cut, haul, and deliver in Lake

Superior, and set afloat and boom it, during the same winter, for $3 per M.; payments to be made in installments as the work progressed. He failed entirely to cut about 400,000 feet, and he left 22,600 feet (as found by the jury) in the creek. He claims he was excused from full performance by a subsequent agreement with the owner and the defendants, and the question whether such an agreement was made was really the controlling question in the case, to which all other questions were subsidiary. The claim is made by the defendants that the original contract made by the plaintiff and defendants was an entire contract, and that the plaintiff was required to show full performance in order to be entitled to recover anything thereon. This contention, however, cannot be sustained. The contract provided for payment in installments as the work progressed, with a reservation of one third, which was to be paid when the entire amount was boomed. Such a contract is not an entire contract, in the sense that full performance must be shown in order to entitle the plaintiff to recover anything. The plaintiff, having performed part thereof, may recover for such part, though he shows no legal excuse for failure to perform the whole, subject, however, to the deduction of the actual damages suffered by the defendant on account of the plaintiff's breach. The reserve fund is a penalty, and not liquidated damages. *Dullaghan v. Fitch,* 42 Wis. 679.

This view of the case clears it of some of the difficulties, and brings us at once to the consideration of the defendants' counterclaims for the alleged breaches of the contract, and of the plaintiff's claim of a subsequent contract by which full performance was waived; and as this subsequent contract is also alleged to have contained the agreement to pay twenty-five cents per M. for hauling logs already cut and banked, on which the plaintiff's second cause of action rests, it is evident that if it was in fact made, and was a valid and binding agreement, the plaintiff was entitled to recover upon both causes of action, and the counterclaim falls. In order to cover this ques-

tion, the court submitted to the jury the first special question, by the answer to which the jury found, in substance, that it was agreed that, if the plaintiff would haul the logs banked on the creek to the pond, he should be relieved from cutting and getting in so much of the standing timber as he could not get in with his force and outfit during that logging season. It is apparent that, if this finding was made without prejudicial error, it disposes of the claim for damages for failure to cut all of the standing timber during that season, *provided* that the contract was valid, and that it further appears that the plaintiff could not get in any more of the standing timber during the season. The defendants claim with reference to this finding (1) that the supposed second contract, if made at all, was not effective, because founded upon no consideration; (2) that there is no evidence to substantiate the claim that it contained the qualifications with regard to the use of the plaintiff's then existing force and outfit; and (3) that the evidence as to whether plaintiff could have got out the balance of the standing timber during the season was conflicting, and, that fact not being determined by the jury, the plaintiff's supposed excuse fails.

We are satisfied that none of these claims can be sustained. There was ample consideration, upon very familiar principles, to support the new promise. The plaintiff was not bound by his original contract with defendants to get the logs to Lake Superior in any particular way. He apparently had his choice of means, so long as the logs were there at the close of the season. He chose to bank them upon the ice of the creek, and rely upon running them down that stream in the spring. This he doubtless had a right to do, as between himself and *McInnis;* thereby assuming the risk of resulting damages in case the creek proved to be an unfit stream to float logs upon. Having deposited about half of the logs on the creek, the plaintiff is met by an order from the owner of the land, which had reserved the right to control the manner of cutting and banking

logs in its contract with *McInnis,* forbidding him from banking any more logs upon the creek. Here arose at once a conflict of claims, rights, and interests between the three parties, which was an eminently fit one for settlement. The plaintiff, while in good faith claiming that he was proceeding within the lines of his contract, was met by an absolute prohibition from further action in that direction, and a proposition or demand that he draw the logs already banked down the creek to the pond. If there was a legitimate and *bona fide* dispute between the parties as to whether he could be compelled to comply with this demand, and such dispute was settled by an agreement such as is claimed here, there was, upon familiar principles, sufficient consideration for a promise by defendants to pay for such service, and to release the plaintiff from further cutting.

As to whether there was evidence to support the qualification embodied in the question put to the jury, namely, that the plaintiff was to use his existing force and outfit, the question presents more difficulty. It is true that there is no direct evidence that this expression was used. Nevertheless we think that, considering the situation of the parties, no other construction can be reasonably implied. The plaintiff testified directly that *John McInnis* told him he would not ask him to cut another stick of standing timber, but that, if he (plaintiff) could get the logs out which were in the creek, he (*McInnis*) would not ask him to do any more; and there was other testimony to the same effect. Considering the situation of the parties, it seems unreasonable to say that the parties could have contemplated anything more than the use by the plaintiff of his existing force and outfit. It was in the midst of the season. The plaintiff had his force of men on the ground, and a camp and logging outfit established, commensurate to the force at work and the contract assumed. There was no intimation of any desire or demand that he should increase the force or the outfit, and it would

·doubtless have been a great task to do so. The talk all seems
·to have assumed the continuance of their present conditions.
Indeed, if it had been intended that plaintiff was to double
his force and outfit, so that he could carry on the hauling and
·cutting at the same time, the proposition that he might cease
·cutting would have been absurd. From these considerations,
we think it clear that the new contract, if made at all, con-
·templated simply the employment by the plaintiff of his ex-
·isting force and outfit. But it is said that there was evi-
·dence tending to show that the plaintiff might, with his ex-
·isting force and outfit, have cut a large amount of the stand-
ing timber after he finished hauling, and that this question
·should have been submitted to the jury and answered in the
negative before the plaintiff could be excused for not fulfill-
·ing his contract entirely. Upon this question the plaintiff
·and his witnesses testified that his camp was broken up some-
where from the 15th to the 20th of March; that it was then
soft weather; that the water in the creek where they were
hauling had raised from two to three feet; that the men
·would not walk in the water; that the biggest part of the
·snow had gone; that where they were loading there was no
·snow at all; that they had to throw snow in front of the rail
to start loads; and that under these circumstances they broke
·camp and ceased work. On the side of the defendants there
was testimony to the effect that the camp was broken up
about the 12th or 14th of March, before other camps in the
·vicinity were broken up; that the weather was somewhat soft
then, but that it became colder right afterwards, and there
·was good, cold weather for cutting and hauling for ten or
·twelve days afterwards. There was no testimony which di-
rectly contradicted the statements of the plaintiff's witnesses
·as to the condition of road and·creek when the plaintiff broke
camp. Doubtless the plaintiff was required to show that he
·used diligence in his work, and did not quit before the reason-
·able judgment of competent men engaged in such business

would dictate as the proper time. Had he quit in February, or any considerable time before the time when spring weather may be ordinarily anticipated in that latitude, the question would have been entirely different. But he did not quit until the middle of March,—a time when it is well known that the weather to be anticipated is a matter of the greatest uncertainty; nor did he quit until, by undisputed evidence, the conditions became nearly or quite impossible for the continuance of his work. He was obliged, also, to haul his logs down the ice of the creek, and the fact that there was from two to three feet of water on the ice was without dispute. In this respect his condition was evidently different from that of other loggers who were hauling in the woods. Under the conditions shown, and considering the time of the year, we think the court was justified in concluding that he worked as long as the judgment of a reasonably prudent man would dictate. The circumstance that, owing to a change in the weather, there chanced to be a few days, late in March, when logs could have been cut and hauled, can have no effect. A verdict that he was negligent in breaking camp when he did would not, in our judgment, have been supported by the evidence.

These considerations, in effect, dispose of the case. There is no question but that the plaintiff was instructed not to use dynamite in getting the logs out of the creek, and no attempt was made to show that he did not get out and haul down all the logs that he could get out without the use of dynamite.

The specific errors assigned do not affect the determination of the material issues, but some of them will be noticed:

The defendants proposed twelve instructions, which were refused; but the question of their correctness is not open to consideration, because no exceptions were taken to the ruling until after the verdict. *Little v. Iron River,* 102 Wis. 250.

Testimony was introduced by the plaintiff, under objec-

tion and exception, of oral conversations between the parties prior to the execution of the written contract as to the manner of getting out the timber, and as to the feasibility of banking it on the creek. The construction which we have given the contract renders the ruling immaterial.

The defendants claim that plaintiff's reply contained inconsistent defenses to the counterclaims. There was, however, but one defense relied upon and submitted to the jury, and no objection was made to the form of the pleading in the trial court. Furthermore, it is well settled that a party may plead as many defenses as he has, although they may be based on inconsistent legal theories. *South Milwaukee B. H. Co. v. Harte,* 95 Wis. 592; Stats. 1898, sec. 2657.

The contract between the defendants and the Red Cliff Lumber Company was offered in evidence by the defendants, and rejected, and exception taken. After the argument to the jury was begun, however, the plaintiff withdrew his objection, and the contract was received in evidence; the defendants objecting to the withdrawal of the plaintiff's objection. It was not claimed that the defendants were debarred from putting in other evidence outside of the contract by reason of its rejection. We can see no prejudice which could result from the fact that it was received so late in the trial, and hence the rulings form no ground for reversal, even if the rejection at first was erroneous. Upon the whole case, substantial justice seems to have been done, without prejudicial error.

*By the Court.*—Judgment affirmed.

Bardeen, J. One of the questions submitted to the jury was whether it was agreed between the parties that, if plaintiff would haul the logs banked in Bardon creek to the lake, he would be relieved from putting in so much of the timber as he had contracted to put in as he could not get in with his

force and outfit during the season. The question of whether the plaintiff worked with diligence, and whether he did not abandon the work before the season closed, was sharply in dispute. The jury made no finding on the subject. This court has assumed to decide the question. I deny its right to do so. It was plainly a jury question. It was a matter much in dispute. The plaintiff was not relieved from the obligation to put in the timber, except it was determined that he used due diligence, and continued his efforts so long as the season lasted. For this court to assume to determine that question, when there was evidence both ways, was a clear usurpation of the jury's functions. A determination of the question was essential to support the judgment. Not having been submitted to the jury, the case should have been sent back for a new trial.