## John E. Shields v. James T. Carson.

1. CONTRACTS—*Effect of a Notice of Intention Not to Comply with Terms of.*—Where a contracting party gives notice of his intention not to comply with the obligation of the contract, the other contracting party may accept such notice as an anticipatory breach, and sue for damages without waiting until the time for the completion and fulfillment of such contract, by its terms; but in order to enable him to sue on such an anticipatory breach, he must accept it as such and consider the contract at an end.

Shields v. Carson.

2. MASTER AND SERVANT—*Obligation of the Servant to Obey all Reasonable Commands of the Master.*—The obligation of the servant to obey all lawful and reasonable commands of the master, is implied from the contract of employment, and a refusal or neglect on his part to obey such a command, which in view of all the circumstances of the case amounts to insubordination, and is inconsistent with his duties to his master, is a sufficient ground for his discharge.

3. SAME—*Disobedience of Reasonable Orders Will Defeat a Recovery of Salary.*—A discharge for disobedience of a reasonable order will defeat a recovery of the salary for the unexpired term, and a voluntary refusal by the servant to perform his contract, is sufficient ground for his discharge.

4. SAME—*Refusal of a Traveling Salesman to Return His Samples.*—A refusal of a traveling salesman employed at a yearly salary to return samples belonging to his employer when requested, is, under the circumstances of this case, sufficient ground for his discharge and will defeat his recovery of his salary for the part of the year remaining after such refusal.

Assumpsit, for breach of contract. Appeal from the Superior Court of Cook County; the Hon. JOSEPH E. GARY, Judge, presiding. Heard in this court at the October term, 1901. Reversed. Opinion filed April 21, 1902.

The appellee recovered judgment against appellant in the trial court for the sum of $648. Appellant, in 1893 and 1894, was engaged in the manufacture of men's neckwear in the city of Chicago. Appellee is a traveling salesman, and in the year 1893 acted as such for Loman's Sons, of Cincinnati, selling for that firm, on commission, underwear, shirts, neckwear, suspenders, gloves, etc. During the year 1894 appellee sold for Loman's Sons the same lines of goods which he had sold for them in 1893, except men's neckwear, in which last that firm had ceased to deal. Appellee sold for Loman's Sons on commission in 1894, and his commissions for sales made by him for them was $2,000 in that year. December 27, 1893, appellant, Shields, met Carson for the first time, and after some preliminary negotiation the parties contracted in writing, as follows:

" CHICAGO, 12–27.

Agreement this day made between J. E. Shields & Co., of the first part, and James T. Carson, of the second part. The said J. E. Shields & Co. agree to pay the said Jas. T. Carson one hundred dollars ($100) per month for each and

every month, commencing January and ending December, 1894. The said James T. Carson to represent the said J. E. Shields & Co. in Kentucky and Tennessee and (Cincinnati, Ohio, when home) to sell line of men's neckwear, said Jas. T. Carson to have credit for all sales from his territory whether made by him personally or sold in house or by mail, all samples sent prepaid. Salary to be sent monthly to Anchorage, Ky.

J. E. Shields & Co.
Jas. T. Carson."

It appears from the evidence that appellee's traveling expenses were paid by Loman's Sons, and that the neckwear which appellee undertook to sell for appellant was what is known among traveling salesmen as a "side line." Appellant testified that prior to his contracting with appellee, appellee told him that he was working for Loman's Sons for a salary, and that during the year 1893 he sold for them $15,000 worth of neckwear. Appellee testified that he told appellant that he was working for Loman's Sons for commissions, and not for a salary, and that he did not tell appellant that he sold $15,000 worth of neckwear in 1893, but may have told him that he sold between $5,000 and $6,000 worth.

Appellee testified that appellant agreed to send him samples the next week after the making of the contract, but that he did not get samples until fifteen or eighteen days after that time; but in a letter from appellee to appellant, of date May 7, 1894, appellee writes: "You remember your samples were not received by me until January 10th, when I should have been out fifteen days before that." Fifteen days before January 10th was December 25th, two days before the date of the contract. Appellant testified that the samples were sent from Chicago to appellee January 2, 1894. May 4, 1894, appellant wrote to appellee the following letter:

"Chicago, May 4, '94.

We are in receipt of your letter of May 2d. Not hearing from you, we supposed you had been sick or away, as we have not heard from you since April 11th. We have footed up your sales to-day and, less goods ret'd by Ray & Rine-

Shields v. Carson.

hart and Newton Bros., amount to $1,287.57. As we have sent you up to date $300, you can readily see how much it has cost us to sell these goods and how ruinous it will be to continue, as the figure of 10,000 or even 8,000 looks very remote at this date. We are willing to do what is fair and right, but can not afford to pay 25 per cent for selling goods. We can not understand why your trade should be so badly behind any other man in the house, when our general trade shows steady increase. We wish to meet you in any spirit that is fair to both, but in all fairness as an honorable man you could not expect to receive money when you do not earn it. If your sales would only show even a chance for us to come out even we would not object, but to steadily go behind, as it will the next two months, only makes the matter worse. Who is to blame, your country or our line? Your early reply will oblige,

Resp. yours,<br>
J. E. SHIELDS & Co."

Appellee answered the foregoing letter by letter of date May 7, 1894, stating, in substance, that the smallness of sales was neither the fault of appellant's line of goods nor appellee's fault, and attributing the small sales to his late receipt of samples and the unsettled condition of the country. Appellee testified that the territory described in his contract with appellant, was the territory in which he sold between $5,000 and $6,000 worth of neckwear in 1893, and appellant testified without contradiction, that the business in his line of the first three months of the year is equivalent to two-thirds of the business of the season, and that, during the season covered by the contract, appellant's general business increased fifty per cent.

Appellee, May 14, 1894, wrote to appellant, suggesting that he had not received his salary for April, etc., when the following correspondence took place:

" CHICAGO, May 16th, 1894.

JOHN T. CARSON, ESQ.
Anchorage, Ky.

DEAR SIR: Your letter of the 7th inst. at hand, and in reply will say that, under the circumstances, I deem it best for you to cease making sales for me, and to consider our business relations at an end. I regret exceedingly that I am compelled to take this course, but the actual sales made

by you fall so far short of the amount which you stated that you could sell, that I am constrained to believe that you did not correctly represent matters at the time your arrangement was made.    And, too, I am not satisfied with the dilatory manner in which you have made reports to me. Until I received your last letter, nearly a month had elapsed during which time I heard not a word from you.    This, of course, is not attending to matters in a business-like way. It seems as though our interest suffered by your furnishing goods line.    You will kindly return samples at once.

Resp. yours,

J. E. SHIELDS & Co."

Letter of May 17, 1894, from Carson to Shields & Co., dated Anchorage, Ky., as follows:

"Yours of the 16th inst. to hand and noted.    I am surprised at its contents.    You attempt to break your contract which I will hold you to, and I will continue to represent you under our written contract, and to show our samples that I have.    I will give to your interest my best ability until our contract expires; have written you to send me fall samples, as I will need them by June 1st; also forward me my salary for April.    This will be presented to you by my friend G. R. Snyder, Jr., of your city, that I may know that you have received it.             Yours truly,

JAS. T. CARSON."

Letter of May 22, 1894, from Shields & Co. to Carson, as follows:

"Yours at hand.    We still adhere to our letter of recent date, discharging you, and will have no business dealings with you hereafter.    It is useless to attempt to send in orders at this time, as they will not be noticed or acknowledged.    You have wasted the past three months, and it is too late to attempt to make up for your past willful neglect of ours and your own interests.

We wrote you our sentiments in the first letter, but you seem disposed to act in anything but an honorable manner towards us, and we think, under the circumstances, our actions perfectly honorable and justifiable.

Respectfully yours,

J. E. SHIELDS & Co."

Letter from Carson to Shields & Co., dated Anchorage, Kentucky, May 26, 1894, stating that he is ready to receive fall samples, and considers himself employed by Shields &

Shields v. Carson.

Co. until the contract expires, and will expect his salary in accordance with the terms of the contract, and that he has placed the matter in the hands of his attorney.

Letter of June 1, 1894, from Shields & Co. to Carson, as follows:

"We again demand return of our samples. Your line of silk cards we can not replace for $125. many of the sets being in such shape we can not cut off small pieces without losing an entire strip. We shall look to you for their full value unless returned at once.

Resp. yours,

J. E. SHIELDS & Co."

Subsequently, June 20 and June 23, 1894, Carson sent two orders for goods to appellant, both of which appellant refused to accept, and notified the parties giving the orders that appellee's connection with appellant had terminated. June 30, 1894, Carson wrote to appellant that if appellant would send to him the original memorandum of samples, he would return the samples, concluding his letter in these words: "I will hold myself in readiness to fill my part of the contract until the year expires, and will expect pay as per our contract." July 5, 1894, appellant answered appellee's last letter, informing him, in substance, that his offer to return the samples came too late; that appellant had been obliged to duplicate them; that they were then unsalable, and that appellant would hold him, appellee, for their full value. This was the last correspondence between the parties. Appellee subsequently sold the samples and realized from their sale $72.14.

The cause was tried by the court, without a jury, by agreement of the parties, and the court found the issues for appellee and assessed his damages at the sum of $648, and judgment was rendered on the verdict.

TENNEY, MCCONNELL, COFFEEN & HARDING, attorneys for appellant.

JONES & ADDINGTON, attorneys for appellee; W. CLYDE JONES and KEENE H. ADDINGTON, of counsel.

Mr. Justice Adams delivered the opinion of the court.

On the receipt by appellee of appellant's letter of May 16, 1894, notifying him, in substance, that appellant would no longer do business with him, one of two courses was open to appellee, namely, either to treat the notice of his discharge from appellant's employ as inoperative and hold himself ready and willing to perform his part of the contract, or to treat appellant's notice as a breach of the contract and sue for damages for such breach. Frost v. Knight, 7 L. R. Exc. 111; Johnstone v. Milling, 16 Q. B. Div. 460; Roehm v. Horst, 178 U. S. 1; Hamlin v. Race, 78 Ill. 422; Mount Hope Cemetery v. Weidenmann, 139 Ill. 67; Foss, etc., Brewing Co. v. Bullock, 59 Fed. Rep. 83; 71 Ill. App. 638.

In Frost v. Knight, *supra*, the court say :

" The promisee, if he pleases, may treat the notice of intention as inoperative and await the time when the contract is to be executed and then hold the other party responsible for all the consequences of non-performance. But in that case he keeps the contract alive for the benefit of the other party as well as his own. He remains subject to all his own obligations and liabilities under it and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it, and in such action he will be entitled to such damages as would have arisen from the non-performance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss."

This is quoted with approval in Roehm v. Horst, *supra*.

In Johnstone v. Milling, 16 Q. B. Div. 467, this language is used :

" It would seem on principle that the declaration of such intention by the promisor is not in itself, and unless acted upon by the promisee, a breach of the contract; and that it

only becomes a breach when it is converted by force of what follows into a wrongful renunciation of the contract. Its real operation appears to be to give the promisee the right of electing either to treat the declaration as a *brutum fulmen* and, holding fast to the contract, to wait till the time for its performance has arrived, or to act upon it and treat it as a final assertion by the promisor that he is no longer bound by the contract, and a wrongful renunciation of the contractual relation into which he has entered. But such declaration only becomes a wrongful act if the promisee elects to treat it as such. If he does so elect it becomes a breach of contract, and he can recover upon it as such."

In Foss-Schneider Brewing Co. v. Bullock et al., 59 Fed. Rep. 83, the following occurs:

" It is true that where a contracting party gives notice of his intention not to comply with the obligation of the contract, the other contracting party may accept this as an anticipatory breach of the contract, and sue for damages without waiting until the time mentioned for the completion and fulfillment of the contract by its terms; but in order to enable the latter to sue on such an anticipatory breach, he must accept it as such and consider the contract at an end. If he elects to consider the contract still in force he can not recover thereafter without performing all the conditions of the contract by him to be performed. These principles are well settled and there are decisions by the Supreme Court of the United States which leave no doubt upon the subject." (Citing cases.)

The question is very fully discussed and numerous authorities cited in Roehm v. Horst, *supra.*

The record is conclusive that appellee elected to consider and treat the contract as in force, and the declaration of appellant's intention as inoperative. This is apparent from appellee's letters of May 17th and 24th and June 30, 1894, set forth in the preceding statement. Having elected to treat appellant's notice as inoperative, and the contract as in force notwithstanding the notice, appellee remained subject to all its obligations, precisely as if the notice had not been given. Frost v. Knight, *supra.*

" An obligation of the servant to obey all reasonable commands of the master, is implied from the contract of employment (Wood's Law of Master and Servant, p. 166,

Sec. 83), and a refusal or neglect on the part of a servant to obey a lawful and reasonable command of the master, which, in view of all the circumstances, amounts to insubordination, and is inconsistent with his duties to his master, is a good ground for his discharge." Ib. p. 223, Sec. 116; 20 Am. & Eng. Ency., 2d Ed., p. 30; Spain v. Arnott, 2 Starkie's R. 256; Hamlin v. Race, 78 Ill. 422.

In the case last cited the Supreme Court say:

" All will concede that an employe must be respectful and obedient to all reasonable commands of his employer and those having control of the business in which he is employed, and no one will dispute that a person so employed, when engaged in the discharge of his business, and in his intercourse with customers and persons transacting business with the house and with his employers, and those having charge of the business, must be respectful and must abstain from all vulgarity and obscenity of language and conduct. If wanting in any of these requirements, it would be ground for discharging a salesman in a store from his employment."

A discharge for disobedience of a reasonable order will defeat a recovery for salary for the unexpired term. Harrington v. First Nat. Bank, 1 N. Y. Sup. Ct. R. 361.

A voluntary refusal of the servant to perform his contract operates as a forfeiture of wages or salary. Lawrence v. Gulliber, 38 Me. 532.

Appellant, in his letter to appellee of May 16, 1894, requested appellee to return appellant's samples, which appellee had. In appellee's letter of May 17, 1894, he substantially refused to return the samples. June 1, 1894, appellant again wrote to appellee, saying, among other things: " We again demand return of our samples." Subsequently, June 6th, 20th and 27th, appellee wrote to appellant, ignoring appellant's request to return the samples, and finally, June 30, 1894, for the first time offered to return them if appellant would send a memorandum of them. It was then too late for appellant to use them, as he had been compelled by appellee's delay to duplicate them for use in his business. Appellee purported to act exclusively for appellant in selling a line of men's neckwear, and it is difficult, if not impossible, to understand why he wanted a

Shields v. Carson.

memorandum from appellant of samples which he had in his possession. The effect of appellee's continued and persistent refusal to return the samples, is to be determined with reference to appellee's own theory, that the contract, notwithstanding appellant's notice of May 13th, was in full force; in other words, as if that notice had never been given, and neither party had desired a rescission of the contract or contemplated its abandonment. Appellee was employed on a salary. He had no pecuniary interest in the samples. They belonged to appellant, his employer. Their return when demanded, could not, in the least, have affected appellee's rights, and the request of the appellant for their return was reasonable and lawful, was a request which the appellant had the right to make, and which appellee had no right to refuse. We think it clear that if, prior to appellant's request for the return of the samples, there had been no disagreement between the parties, and that both of them at the time of the request were contemplating the contract as in full force, appellee's refusal to return the samples would have been good ground for his discharge; and if good ground for discharge on the theory of appellee that the contract was in force, it is sufficient ground to defeat a recovery for salary for the part of the year which remained after appellee's refusal. Appellee refused, May 17, 1894, to return the samples, and adhered to his refusal until they were valueless to appellant. He was paid his salary of $100 per month for the months of January, February and March. The value of the samples retained by him was, as shown by the evidence and not controverted, $250—enough to pay his salary for the months of April, May and the half of June. We are of opinion that appellee, by reason of his refusal to return the samples, is not entitled to recover anything. We are not prepared, however, to hold that the finding of the court that the discharge was wrongful, is manifestly against the evidence.

The judgment will be reversed.