Hoffman vs. King.

HOFFMAN, Appellant, vs. KING, Respondent.

*December 13, 1887 — January 10, 1888.*

*Contracts: Condition precedent: Rescission: Replevin.*

H. agreed to sell to K. certain lumber, to be delivered on the skids at
H.'s mill as fast as it could be sawed, K. agreeing to keep the lum-
ber from accumulating on the skids. *Held,* that the agreement to
keep the lumber from accumulating did not amount to a condition
precedent to further performance of the contract by H., but was
an independent agreement, the breach of which did not authorize
H. to rescind the contract and maintain replevin for lumber al-
ready delivered and removed.

APPEAL from the Circuit Court for *Jackson* County.

The following statement of the case was prepared by
Mr. Justice CASSODAY:

December 27, 1881, the plaintiff, *Fred J. Hoffman,* and
the defendant, *William T. King,* entered into a written
contract, wherein and whereby, in effect, *Hoffman* agreed
to sell and deliver to *King,* at what was known as "Dick
Noble's Mill," in Jackson county, Wisconsin, 1,000,000 or
more feet of merchantable pine lumber, the same to be
cut and sawed into lengths and sizes or dimensions as di-
rected from time to time by *King,* "to be delivered on skids
at end of mill, assorted in lengths but not in size," etc., "as
fast as same" could "be sawed each day by" said mill,
from the date thereof until March 15, 1882, and as much
later as would permit of practically hauling the same from
said mill on sleighing or frozen ground or ice, that winter;
and, in consideration thereof, *King* agreed to pay "for said
lumber so delivered," three and a half dollars per thousand
feet on all so delivered "every thirty days," and the bal-
ance thereof, to wit, three and a quarter dollars per thou-
sand feet when the contract was completed; and "the title
to said lumber" was "to be and remain in said" *Hoffman,*
"as his interest" might "appear, as per" said "contract,

until the purchase price " therein stated should " be fully paid
or other security satisfactory to him given." Said *King* " also
agreeing to keep said lumber from accumulating on said
skids in mill-yard, either by hauling it away or piling
at least twenty-four feet from mill track," said *Hoffman*
thereby " agreeing to furnish the ground necessary, without
additional charge, for the purpose of piling said lumber,
until such time as it " might " be practically hauled away
to " Meadow Valley or Mill Grove, in Juneau county.

This action was commenced April 18, 1882, and it was,
in effect, alleged in the complaint, that in pursuance of said
contract, and prior to March, 1, 1882, *Hoffman* had put into
said mill about 900,000 feet of pine saw logs, and that prior
to March 6, 1882, about 600,000 feet thereof had been
sawed at said mill, of which 359,421 feet had been actually
delivered to *King;* that on or about March 6, 1882, *King*
utterly refused to receive any more lumber and timber on
said contract, and for some time prior thereto had refused
and neglected to keep said lumber from accumulating on
the skids in the mill-yard, although often requested to re-
move the same; that by reason thereof, there had, on that
day, accumulated on said skids about 200,000 feet, and con-
sequently said mill was compelled to and did stop sawing
for a number of days; that *Hoffman* was compelled to and
did remove the same from said skids, thereby delaying and
hindering the plaintiff from hauling logs to the mill on the
contract; that by reason of such refusals, *Hoffman* neg-
lected to put more logs into the mill; that *King* had also
failed and neglected to pay for the lumber so received by
him within thirty days from the date of such reception,
and failed to keep and perform any of the conditions of the
contract; that *King* had only paid or settled for 183,437
feet of the lumber so actually received by him, and that
the time for paying or settling for the balance had long
since expired; that *King* refused to pay, settle, or return

to *Hoffman* the 175,984 feet so not paid or settled for, though often requested so to do; that said last-named amount of lumber was then at Meadow Valley, and that *Hoffman* was still the owner of the same, and lawfully entitled to the possession thereof; and that the same was of the value of $1,200; and that *King* wrongfully and unjustly withheld and detained the possession thereof from *Hoffman*, to his damage in that amount; wherefore he demanded judgment against *King* for the recovery of said last-named lumber, or $1,187.89, the value thereof, in case a delivery thereof could not be had, with $300 damages, as well as costs.

The answer admitted the contract, the receiving thereon of 359,421 feet of such lumber, and alleged, in effect, that the defendant had paid thereon $1,267.25; that he had always been ready, able, and willing to carry out and perform each and every part and condition of the contract for him to be carried out and performed; but that March 6, 1882, *Hoffman* utterly refused to deliver to him any more lumber under the contract, and since had continued to so refuse, and failed to perform or comply; that March 15, 1882, the defendant tendered to *Hoffman* the balance due him under the contract, and then and there tendered and offered to him full and complete performance thereof, and full payment for the balance of lumber still due him thereon, and demanded the same, but that *Hoffman* refused to accept such payment or deliver the balance, for the reason that the price had increased three dollars per thousand since the making of the contract, and alleged ownership of the property described in the complaint, and the release of the same by his giving the requisite undertaking, with a general denial of each and every allegation not admitted.

At the close of the trial the jury returned a verdict to the effect that the defendant was the owner and entitled to the possession of the lumber described in the com-

plaint. From the judgment entered thereon, the plaintiff appeals.

For the appellant there was a brief by *C. F. Ainsworth*, attorney, and *Pinney & Sanborn*, of counsel, and oral argument by *Mr. Pinney*. To the point that, after lumber sawed in pursuance of the contract had accumulated on the skids, it was a condition precedent to further sawing that the defendant should remove such accumulation, they cited *Kellogg v. Nelson*, 5 Wis. 125; *School Dist. v. Hayne*, 46 id. 511; *Suber v. Pullin*, 1 Rich. (S. C.), 273; Bishop on Contracts, secs. 827, 828; *Norrington v. Wright*, 115 U. S. 188; *Mill Dam Foundry v. Hovey*, 21 Pick. 439; *Thomas v. Cadwallader*, Willes, 496; *Knight v. N. E. Worsted Co.* 2 Cush. 286; *Coombe v. Greene*, 11 Mees. & W. 480; *Clement v. Clement*, 8 N. H. 210; *Hill v. Hovey*, 26 Vt. 109; *Honck v. Muller*, L. R. 7 Q. B. Div. 92; *Hoare v. Rennie*, 5 Hurl. & N. 19; *Coddington v. Paleologo*, L. R. 2 Exch. 193; *Bowes v. Shand*, L. R. 2 App. Cas. 455; *Reuter v. Sala*, L. R. 4 C. P. Div. 239; *Hill v. Blake*, 97 N. Y. 216; *King Philip's Mill v. Slater*, 12 R. I. 82.

For the respondent there was a brief by *L. P. Powers*, attorney, and *Gardner & Gaynor*, of counsel, and oral argument by *Mr. Gardner*.

CASSODAY, J. The mill at which the lumber was sawed was situated on Hog island, so called. It had the capacity of manufacturing about 12,000 feet of lumber per day. To aid in handling the lumber thus manufactured, there was a car track constructed, extending out from the mill some four or five hundred feet, and elevated from two to seven feet above the ground. Along one side of this track, and perpendicular to it, skids were placed, upon which the lumber contracted for was to be piled or delivered by the plaintiff when removed from the car. Such delivery was to be made as fast as the lumber could be sawed by the

mill from the date of the contract until March 15, 1882, and as much later as would admit of practical hauling to the railroad station on sleighing, frozen ground, or ice. The railroad stations at Meadow Valley and Mill Grove, mentioned in the contract, were each some six or seven miles distant from the mill in question. From the mill to either of those stations there were none other than corduroy roads over a marsh or marshes, available only when frozen hard. It was over such road or roads that the defendant hauled from the mill to such stations, or one of them, the 359,421 feet of the lumber mentioned. It is conceded that upon that lumber the defendant had paid the plaintiff the first instalment of $3.50 per thousand feet, amounting to $1,267.25, and that the other instalment of $3.25 per thousand feet would not, by the terms of the contract, become due thereon until after the delivery on the skids by the plaintiff of the entire million feet of lumber called for by the contract.

It appears from the evidence that whenever there was a thaw, so as to make it impracticable to draw the lumber to the railroad station over the corduroy roads, the defendant allowed it to accumulate, more or less, on the skids along the track running out from the mill. Thus, it is said that some time in January, or the fore part of February, 1882, and when there was only about 50,000 feet upon the skids, it was so accumulated at certain points along the track as to make it necessary on the part of the plaintiff to stop the mill for a few hours and pile the lumber back further from the track; and that the same was substantially repeated a week or two afterwards. No rescission of the contract, however, was attempted or is claimed by reason of either of those accumulations. But about March 6, 1882, such lumber was again allowed to accumulate upon such skids, until it reached about 200,000 feet, when, it is claimed, the mill was necessarily stopped for a few days, and the same was piled back further from the track, by the procurement

of the plaintiff, at an expense of forty or fifty dollars. We find in the bill of exceptions considerable evidence on the part of the defense to the effect that on the day the mill shut down, to wit, Monday morning, March 6, 1882, some half a dozen men went to the mill, on the part of the defendant, to remove the lumber back from the skids, but that the plaintiff refused to allow them to do so, and insisted that the lumber was his, and that the defendant should have no more of it; and that there was then among the lumber so accumulated on the skids from thirty to forty thousand feet of culls not included in the contract. The plaintiff's evidence is to the effect that there were no culls among such accumulations; but he concedes, in effect, that after he had so removed the lumber back into the yard, and before the commencement of this action, the defendant came to him and offered to pay him up if he would let him have the lumber upon the contract, which he declined to do.

The defendant never received any portion of this 200,000 feet, and of course the lumber here replevied includes no part of it. On the contrary, it stands confessed by the plaintiff, that he forbade the defendant from removing any portion of it unless he would first pay the expense and damage consequent upon such failure to remove; whereas the defendant claims that he was prevented from removing such lumber by the plaintiff himself, and besides was excused from such removal under the decision on the former appeal (58 Wis. 314), by reason of the mixture with it of inferior lumber by the plaintiff. The defendant never received any of the lumber contracted for, except the 359,421 feet mentioned, which the defendant had hauled from the mill to the railroad station. It is conceded that a very large portion of the lumber thus contracted for was never delivered upon the skids, nor sawed by the plaintiff. This action is only to recover 175,984 feet of the lumber which the defendant had thus hauled to the railroad station. It

is based wholly upon the alleged right of a partial rescission of the contract. Whether there had ever been any such rescission by agreement of the parties,— that is to say, by the refusal of the defendant, with the consent of the plaintiff, to receive any more lumber on the contract,— was fully and fairly submitted to the jury with instructions to find for the plaintiff if it had; and their verdict in favor of the defendant is, in effect, that he never so refused, and consequently there was no such agreement, and hence no such rescission. It is difficult to perceive how the jury, upon the evidence, could have found otherwise, since the plaintiff himself, in effect, concedes that the defendant at all times insisted to him that he must have the lumber.

The fact thus determined by the jury is one deemed of special significance on the question of rescission by the more recent English cases. Thus Lord COLERIDGE, C. J., said, as the result of conflicting cases, "that the true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract." *Freeth v. Burr*, L. R. 9 C. P: 213. In a more recent case, JESSEL, M. R., said that "there is no absolute rule which can be laid down in express terms as to whether a breach of contract on the one side has exonerated the other from performance of his part of the contract." He then reiterates the rule above quoted from the chief ·justice, and adds, "that makes it a question of evidence." *Mersey S. & I. Co. v. Naylor*, L. R. 9 Q. B. Div. 657. The same rule was sanctioned in the same case on appeal in the House of Lords. L. R. 9 App. Cas. 438, 439. In such submission to the jury they were, in effect, charged that "the *only* question they should consider was whether there was such rescission by such mutual agreement of the parties."

This brings us to the question whether there was any error in the court holding, as a matter of law, that there had been no valid rescission of the contract by reason of

the defendant's breach of the stipulation therein to keep the lumber from accumulating upon the skids. The rule laid down by Lord MANSFIELD, C. J., and often quoted approvingly, is, "that the dependence or independence of covenants was to be collected from the evident sense and meaning of the parties, and that however transposed they might be in the deed their precedency must *depend on the order of time* in which the intent of the transaction requires their performance." *Jones v. Barkley*, 2. Doug. 691. To the same effect, *Bettini v. Gye*, L. R. 1 Q. B. Div. 187; *Tipton v. Feitner*, 20 N. Y. 425; *Cadwell v. Blake*, 6 Gray, 407. Applying that rule here, and we find that the plaintiff was, from day to day, and as fast as sawed, to assort and deliver the "merchantable pine lumber" upon the skids. As fast as it was so delivered it became the property of the defendant, subject, of course, to the conditions mentioned in the contract. The defendant was to keep it from accumulating upon the skids, either by piling it back further in the yard, or by hauling it away to the railroad station as he did the 359,421 feet. The defendant was not required by the contract to pay the first instalment thereon until every thirty days after each such delivery. That instalment had been fully paid, prior to the time of the alleged rescission, on all the lumber which had thus been hauled to the railroad station, and had not yet become due as to any of the 200,000 feet of lumber then remaining upon the skids. This eliminates from the case, or rather excludes from it, the question which has so frequently troubled and divided courts, to wit, whether a delay or default in making one of several payments, or a delay or default in making delivery of one of several portions of the goods contracted for, will authorize the other party to rescind the unperformed portion of the contract, or the whole of it. For discussions of that question, see the recent English cases cited above, and *Norrington v. Wright*, 115 U. S. 188.

The next and last thing in order of time required by the contract, was the payment of the three dollars and a quarter per thousand feet when all the lumber called for therein should be finally delivered. The question, therefore, is presented, whether the plaintiff was, of right, entitled to such partial rescission of the contract, merely because the defendant allowed such last accumulation upon the skids to reach the amount mentioned. Of course, with the mill sawing lumber at the rate of 12,000 feet per day, it became an imperative necessity, in order to keep the mill running, for the plaintiff to remove the lumber away from the mill substantially as fast as sawed. For that purpose, he, or rather the mill-owner, caused the track to be constructed. There was a big swamp on one side of it, and between that and the track the plaintiff claims to have put the culls. But upon the other side of the track, where the skids were, upon which the defendant's lumber was piled, there was plenty of ground upon which to pile all the defendant's lumber so as to prevent any considerable accumulation upon the skids. Under the contract the defendant was to have the use of such grounds for such piling purposes " without additional charge." Manifestly, such piling back from the track, or hauling away, was for the mutual benefit and convenience of both parties, especially the plaintiff. Without out one or the other, all vacancies at and about the mill and along the track would necessarily soon become filled, and hence the removal of the lumber from the mill thereafter become obstructed. The same would have been true in the absence of any contract for the sale of the lumber. Without hauling it away the piling of it back from the mill or the track was a necessary incident to the continuous running of the mill. The stipulation in the contract for such removal from the skids, therefore, was merely to relieve the plaintiff, or mill-owner, from what he would otherwise have been obliged to do as an incident to such continuous run-

ning of the mill. Such failure to remove in no way inter-fered with the delivery of the 359,421 feet, which had previously been hauled to the railroad station; nor with the delivery of the 200,000 feet upon the skids, which had thus been allowed to accumulate. Without further removal from the skids by any one, it could only interfere with the delivery upon the skids of the unsawed balance of the million feet called for by the contract.

We are not here called upon to consider whether, upon the facts stated, the plaintiff would have been excusable for any delay or failure to deliver the unsawed balance of the million feet of lumber, nor whether he was excusable for refusing to let the defendant have the lumber which had thus been delivered and still remained upon the skids, nor whether he was entitled to a lien upon that lumber for the expense and service of removing it from the skids back further into the yard. This action is to reclaim a portion of the lumber which had been previously delivered, ac-·cepted, and hauled to the railroad station. The plaint-iff did not return, nor offer to return, any of the money he had received in part payment thereof, and he makes no claim to any rescission or attempted rescission of the whole contract. Ordinarily a party must rescind a contract *in toto* or perform it. He cannot rescind it in part and affirm in part. *Hendricks v. Goodrich*, 15 Wis. 679; *Hyslip v. French*, 52 Wis. 516-517; *Gale v. Nixon*, 6 Cow. 445; *Mansfield v. Trigg*, 113 Mass. 350. With the facts necessarily found by the jury as verities in the case, the plaintiff's right to re-cover, therefore, is based entirely upon the theory that the contract was divisible, and that the defendant's failure to keep the lumber from accumulating upon the skids was such a breach as authorized the plaintiff to rescind so much of the contract as did not relate to the lumber which had been hauled to the railroad station, and upon which the first instalment had been fully paid, and then to affirm

that part of the contract and reclaim a portion of that lumber for an alleged default in not paying the last instalment, which, as conceded, but for such rescission, would not have become due until the million feet called for by the contract had been fully delivered. .

There are certainly some difficulties in maintaining this theory as applied to the facts. "The rules of law on the subject of conditions in contracts are" said to be "very subtle and perplexing." 2 Benj. Sales, § 852. This perplexity often grows out of attempts to apply a supposed fixed general rule to facts to which it is not applicable. Without attempting the difficult, if not impossible, task of analyzing and reconciling the numerous apparently, if not really, conflicting decisions in this country and England, it may be well to reproduce a few general rules, as stated by Chief Justice SHAW in a case cited and relied upon by counsel on both sides. *Mill Dam Foundry v. Hovey*, 21 Pick. 417. He there said: "It seems to be well settled that when there is a stipulation amounting to a condition precedent, the failure of one party to perform such condition will excuse the other party from all further performance of stipulations depending upon such prior performance. But a failure to perform an independent stipulation, not amounting to a condition precedent, though it subject the party failing to damages, does not excuse the party on the other side from the performance of all stipulations on his part." Page 437. "That in order to construe a stipulation on one side to be a condition precedent to an obligation to perform on the other side, it must, in general, appear, *either* (1) that the undertaking on one side is, *in terms*, a condition to the stipulation on the other; as where one stipulates that he will perform the thing to be done, if the other shall have first performed some stipulation on his part; and even when words are used which might be construed to be a condition in their ordinary sense, they shall not be so consid-

ered if such construction is not consistent with the intent of the parties." Page 438. " Or (2) it must result from the nature of the acts to be done and the order in which they must necessarily precede and follow each other in the progress of performance. . . . But when the act of one is not *necessary* to the act of the other, though it would be *convenient*, useful, or *beneficial*, yet as the want of it does not prevent performance, and the loss and inconvenience can be compensated in damages, the performance of the one is not a condition to the obligation to perform by the other. Or (3) the nonperformance on one side must go to the entire substance of the contract, and to the whole consideration, so that it may be safely inferred as the intent and just construction of the contract that if the act to be performed on the one side is not done, there is no consideration for the stipulations on the other. And, therefore, though there be a breach of an express or implied covenant on one side, attended with some loss and damage to the other, yet if it does not go to the whole consideration, and the loss can be compensated in damages, the stipulation must be construed to be independent, for breach of which the party sustaining such loss has his remedy by action; but it is not a condition precedent, upon the nonperformance of which the other party is absolved from the performance of the stipulations on his part." Page 439. See, also, *Kellogg v. Nelson,* 5 Wis. 125; *Goodwin v. Merrill,* 13 Wis. 658; *Sawyer v. C. & N. W. R. Co.* 22 Wis. 403; *Scott v. Kittanning Coal Co.* 89 Pa. St. 231; *Blackburn v. Reilly,* 47 N. J. Law, 290.

Here the lumber was to be delivered upon the skids as fast as sawed. The first instalment per thousand feet was to be paid thereon "every thirty days" after each such delivery. Such delivery, therefore, may have been a condition precedent to such payment; and it may be assumed that such payment, when due, was a condition precedent to

any subsequent delivery. While the agreement may have given the defendant thirty days after each such delivery to make such payment thereon, for the very purpose of enabling him first to haul the lumber so delivered to the railroad station and then sell and dispose of the same in order to raise the money with which to make such payment, so the agreement may have exacted such payment at that time for the very purpose of enabling the plaintiff to pay the expense of continuing such manufacture and delivery thereafter. But the last instalment of three dollars and a quarter per thousand feet was to be one entire payment, only to become due "when" the contract should be fully "completed." There is nothing in the wording of the contract indicating any purpose of severing such last instalment into parts, and applying some fraction thereof in payment of any particular portion of the lumber. · By the terms of the contract, therefore, such full and complete delivery was a condition precedent to the right of requiring the defendant to make that payment or any part thereof. And yet this action is based upon a supposed default in making a part of that payment, without the performance or tender of performance of such condition precedent, and upon the theory that the plaintiff had a right of severance not given in terms by the contract. If there is any such right of severance, therefore, it must arise out of the alleged right of such partial rescission, to be held equivalent to full completion or performance. Certainly the contract does not in terms make the prompt removal of the lumber from the skids a condition precedent to any further delivery or performance on the part of the plaintiff. Nor was such removal absolutely necessary to such further delivery or performance. It merely went to the convenience of the plaintiff or mill-owner in making such delivery, and had the defendant's men been allowed to remove the lumber, it would, at most, have caused a short delay. It did not go to the entire

substance, nor to the whole consideration, of the contract. Such loss by reason of such inconvenience could readily have been compensated in damages. It is like the stipulation for keeping the tools in repair mentioned by SHAW, C. J., in the case above cited. It is like the agreement of the lessors to repair, and the agreement of the lessees "to run, the mill not to exceed 300 cuts of the saw per minute," in *Hinckley v. Beckwith,* 23 Wis. 328. See *Smith v. Scott,* 31 Wis. 439.

We must hold that such stipulation for keeping the lumber from accumulating upon the skids was an independent agreement, for the breach of which the plaintiff had mistaken his remedy.

*By the Court.*— The judgment of the circuit court is affirmed.