### BARKER & STEWART LUMBER CO. v. EDWARD HINES LUMBER CO.

#### (Circuit Court, W. D. Wisconsin. March 13, 1905.)

#### No. 102.

1. CONTRACT FOR SAWING LOGS—CONSTRUCTION—BREACH.

Defendant purchased a large quantity of logs to be delivered to it at a rate not exceeding 40,000,000 feet each year. It then entered into a contract with plaintiff to receive and saw such logs at a rate not to exceed 35,000,000 feet per year until all should be sawed; the contract providing that, should more than that quantity be delivered to it under its prior contract of purchase, it should have the right to saw the excess at other mills. Subsequently, defendant having purchased additional timber, and contracted to have the same logged by the same firm which was logging the first, a supplemental contract was entered into between the parties, extending the first sawing contract to such logs. *Held*, that such contract could not be construed to permit defendant, while 35,000,000 feet were being delivered to and sawed by plaintiff under the original contract, to itself cut and saw the timber of its second purchase, on the theory that the same was "excess," within the meaning of the first contract, which would give it the option to render the second contract wholly nugatory, but that it must be construed with reference to the fact, known to both parties, that it had been arranged that both tracts should be logged by the same firm, and of the practical limitation on the quantity which they could cut and deliver at plaintiff's mill in a season.

2. SAME—PARTIAL BREACH—RIGHT TO SUE BEFORE FULL PERFORMANCE.

Plaintiff contracted to saw the logs from certain lands, delivered at its mill by defendant—a stated quantity each year. Defendant having purchased other timber, by a supplemental agreement the contract was extended to such timber. Defendant thereafter, and while plaintiff was engaged in sawing logs from the land covered by the original contract, and before the time had come for delivering logs from the second purchase, caused the same to be cut and sawed elsewhere; acting however, in good faith, upon an erroneous construction of the contract. *Held*, that while such action was an absolute breach of a part of the contract, by rendering its performance impossible, such part was an independent one, and, its breach not having been intentional, did not go to the full scope and consideration of the contract, so as to excuse plaintiff from further performance, nor give it a right of action until it had performed up to the time when it became the duty of defendant to deliver the additional logs, and the breach became actual and effective, instead of merely anticipatory.

At Law. On motion for direction of verdict.

Richard Sleight and John M. Olin, for plaintiff.

Herrick, Allen, Boyesen & Martin and R. M. Bashford, for defendant.

SANBORN, District Judge. The defendant at the close of the plaintiff's testimony moves to strike out all evidence relating to profits claimed by plaintiff, and further to exclude all evidence given on behalf of the plaintiff, and to direct a verdict in favor of the defendant, as to the first cause of action.

The most important question relates to the construction of the contracts made between the defendant and the assignors of the plaintiff, a copartnership known as Barker & Stewart. The claim of the plaintiff is for damages based upon the act of the defendant in withdrawing from the contract between the parties certain timber known as the Bigelow timber, and some 7,000,000 additional known as the Hines Lumber Company timber, and sawing it at the defendant's mill. It is claimed by the plaintiff that this timber was brought within the contract by the last written agreement made between them, while the defendant claims that it had the option under that agreement to so withdraw such timber.

On June 14, 1898, a contract was made between Weyerhaeuser & Rutledge and the defendant, providing that Weyerhaeuser & Rutledge would, from lands owned by them in townships 48 and 49, ranges 7 and 8 west, cut into saw logs all the merchantable pine on such lands, estimated at 187,000,000 feet, and would deliver said logs to the Hines Company at certain booms on Chequamegon Bay. Such logs were to be delivered in quantities of not less than 20,000,000 feet or more than 40,000,000 feet annually until all such timber was delivered.. The defendant company was to give notice in writing to Weyerhaeuser & Rutledge prior to November 1st each year of the amount it desired to have delivered during the ensuing year. Such notices requiring the delivery of the full amount of 40,000,000 feet have been given for each year, including the year 1905. Deliveries of logs under this contract were to begin after January 1, 1899, so as to permit the manufacture of the logs by March 1, 1899, and Weyerhaeuser & Rutledge agreed to make annual deliveries thereafter until all the logs were cut. The defendant company was to accept all such logs, and pay for the same within 90 days after the end of the month of delivery. On the 19th day of June, 1900, and in each year thereafter during the existence of the contract, defendant was to pay Weyerhaeuser & Rutledge interest from June 14, 1899, on the stumpage value of the logs delivered during the preceding year, but on June 14th in each year there was to be credited to the defendant company interest on all cash payments made by it for logs received during the preceding year. After further provision in respect to a contract made by Weyerhaeuser & Rutledge with the Standard Construction Company for the cutting of the logs, the lands are described upon which the logs are situated, and certain other agreements were made, not material to this controversy.

On October 6, 1898, the first contract between Barker & Stewart and the defendant company was made. It recites that the defendant has made the Weyerhaeuser & Rutledge contract, and in general its provisions, and that the Hines Company was desirous

of having said logs manufactured into lumber at or near the point of delivery, and Barker & Stewart desired to secure a contract to manufacture a portion of said logs into lumber, and were familiar with the terms of the Weyerhaeuser & Rutledge contract. It was therefore agreed that Barker & Stewart should prior to March 1, 1899, build, erect, and fully equip a sawmill capable of sawing at least 35,000,000 feet of lumber during each sawing season, working both night and day, and that they would build the mill and have it ready to commence manufacture on or before March 1, 1899. It was further agreed by Barker & Stewart that between March 1st and December 1st of each year thereafter, until all the said logs were manufactured into lumber, they would at their sawmill manufacture into merchantable lumber, in a proper manner, not less than 25,000,000 or more than 35,000,000 feet of the Weyerhaeuser & Rutledge logs. The quantity to be manufactured each year, within the limits so specified, was to be fixed by the defendant company giving notice in writing to Barker & Stewart on or before November 1st each year of the quantity which it desired to have manufactured into lumber during the next sawing season. Such notices have been given for each year at the full amount of 35,000,-000. Barker & Stewart further agreed to continue the manufacture at the full capacity of the mill until the close of the sawing season each year, and manufacture all logs delivered to them by defendant within the specified limits, and would not manufacture for others at any time when there were sufficient of defendant's logs available to keep the mill running to its full capacity for a week unless the defendant should, in writing, consent thereto. It was further provided that the lumber should be sorted and piled into 35 sorts or piles. They further agreed to manufacture lath which would grade No. 1. Various other provisions are contained for the manufacture, sorting, and piling of the lumber. Barker & Stewart further agreed to accept all the logs so to be manufactured as delivered by Weyerhaeuser & Rutledge, and such delivery should be considered a complete delivery under the contract of October 6, 1898. Defendant, on its part, agreed to deliver such logs up to the amount to be manufactured in each year. Then comes the following provision:

"But it is understood that if under the said contract of June 14, 1898, or by other agreement with the said Weyerhaeuser and Rutledge the said second party [Hines Lumber Company] shall have more than 35,000,000 feet, board measure, of logs covered by said contract of June 14, 1898, cut and delivered as aforesaid in any one or more years, then the second party shall have the right to have such excess manufactured at mill selected by it other than the one owned by the first party [Barker & Stewart]."

Defendant should only be required to deliver to Barker & Stewart such logs as were delivered by Weyerhaeuser & Rutledge under their said contract, and no damage was to accrue to or be recovered by Barker & Stewart on account of nondelivery of logs for any reason specifically mentioned in the Weyerhaeuser & Rutledge contract, or because of the nonperformance of that contract for any other reason not the fault of the defendant. Barker & Stewart were to

receive for sawing $1.85 per thousand for lumber, and 85 cents for lath. It is further provided that, if the mill should be accidentally destroyed by fire or otherwise, Barker & Stewart will rebuild within 90 days after such destruction, and will then proceed with the performance of the contract. No damage was to accrue to defendant for the suspension of operations during the 90 days, provided it should have the right, if it so desired, to have logs delivered under the Weyerhaeuser & Rutledge contract manufactured during said period at some other convenient mill in the vicinity; Barker & Stewart to pay any excess over the contract price for such manufacture. If Barker & Stewart should default in the performance of the contract, defendant might stop further manufacture, and cause the Weyerhaeuser & Rutledge logs to be manufactured at other mills, and Barker & Stewart were to pay any damages which defendant might thereby suffer. Provision was made for the assignment of the contract.

On February 19, 1902, the second or modifying contract was made between Barker & Stewart and defendant, the first provision of which is as follows:

"Second party agrees in addition to the timber contracted under the said above named contracts to be furnished the first party for sawing to also give and furnish the first party for sawing all of the timber which the second party now owns, or which it may acquire during the life of said contracts as hereunder modified, in the townships and ranges covered by the descriptions mentioned in the above contract of October 6th, 1898, such logs to be delivered at the place specified under said contract. First party agrees to receive said logs at such place, and manufacture same as provided in last mentioned contract as hereby modified. It is agreed that all of the provisions of said contract of October 6th, 1898, as hereby modified, shall apply on all additional logs herein mentioned as though such logs had been specifically mentioned in said three contracts as hereby modified."

This provision applies to the Bigelow and Hines timber in question, amounting to about 71,000,000 feet.

This contract provided that, instead of 35 sortings or piles, there should be 75; and certain other provisions were made for more particular care of the lumber to be sawed and loaded, and also that defendant was to take all of the lumber manufactured from its logs, including 4-foot lumber, and that all offal, including trimmings, sawdust, and what remains of the slabs and edgings after making Nos. 1, 2, and short lath, should belong to "second party" (that is, the defendant), but, if second party should consider that any portion of the product was not worth the saw bill, then such portion should become the property of Barker & Stewart, without charge; defendant agreeing to take all of Nos. 1, 2, and short lath and 4-foot lumber, and pay the saw bill. The price for sawing was increased from $1.85 to $2.02½ for lumber, and from 85 cents to $1.20 for lath per thousand pieces and $1 per thousand pieces for the short lath. Also $1.25 per thousand feet for kiln-drying lumber, and 18¾ cents per thousand pieces for kiln-drying lath.

By the tenth provision of this contract it is provided that Barker & Stewart would do winter sawing under the modified contract,

provided it should give notice not later than December 1st of any year that it would require the same, and defendant was in that case to request Weyerhaeuser & Rutledge to do winter logging, and furnish enough logs to Barker & Stewart for three months' winter sawing, and that it would use all reasonable endeavors to have Weyerhaeuser & Rutledge do so. It appears in evidence that Weyerhaeuser & Rutledge had a logging railroad from the lands in question to Ashland. Then follows the provision for the prices for winter sawing.

The thirteenth provision is to the effect that, except as therein specifically modified, the contract of October 6, 1898, and all its terms, conditions, and provisions, should remain in full force and effect, and that this contract and prior contracts thereby modified might be assigned by second party to a corporation of the same name to be organized by the second party.

Prior to the making of the second contract, and on November 13, 1900, the defendant made another contract with Weyerhaeuser & Rutledge, by which the latter agreed to cut all the merchantable pine, spruce, and tamarack timber owned by defendant for which it then had an option to purchase or might purchase within three years, amounting to about 100,000,000, and located in the same townships described in the first Weyerhaeuser & Rutledge contract, except six sections in said townships and ranges, and that it would cut, haul, and deliver said timber at the rate of from 5,000,000 to 15,000,000 during the first year, and after the first year from 15,000,000 to 25,000,000, until all the timber was cut, commencing January 1, 1901. The manner of cutting was provided, the price, and various provisions in relation to scaling, etc.

The two contracts between Barker & Stewart and defendant were duly assigned to the plaintiff company.

Either prior to the time when the second contract was made, or shortly thereafter, the defendant company acquired timber in said townships and ranges, 7,000,000 feet of which is described generally as the Hines Lumber Company timber, and 64,000,000 of which was the Bigelow timber, so called; and in 1902 and 1903 the defendant company, in good faith claiming the right to do so under its interpretation of the contract, and without any intention to interrupt the performance of the contracts in other respects, logged 71,000,000 feet of the timber so acquired, and sawed the same at a mill at Ashland known as the Bigelow Mill, which the defendant had purchased from the Bigelows. It is claimed by the plaintiff that this act of the defendant was in breach of the first provision of the second contract, that by sawing said timber at its own mill the defendant thereby destroyed the subject-matter of the contract, and that that part of the contract was thereby broken, giving rise to a cause of action for damages in favor of Barker & Stewart, which it is claimed has been assigned to the plaintiff, and it is for this breach that this action is brought.

The defendant claims that under the contracts in question it had the right to manufacture such timber at its own mill, and that at all

events this action is premature, inasmuch as the plaintiff has not elected to treat such alleged breach by the defendant of this part of the contract as putting an end to the contract, but, on the other hand, that the plaintiff has gone on and is still going on in performance of the contract so far as it relates to the Weyerhaeuser & Rutledge timber, and that it will take at least two years longer to manufacture that timber, so that the time of performance of that part of the contract relating to the additional timber will not arrive before the season of 1907 at the earliest.

As stated, the important question relates to the construction of the various contracts above mentioned. It is insisted on the part of the defendant that the provision in respect to the right of the defendant to manufacture the excess of timber over 35,000,000 feet per year gave it the right, if it could procure such timber to be logged, to manufacture any part or all of both the Weyerhaeuser & Rutledge timber and the additional timber in any one or more years in excess of 35,000,000, while it is claimed by the plaintiff that the excess mentioned in the quoted provision from the second contract relates only to the excess of 5,000,000 over the 35,000,000 to be manufactured by the plaintiff in each year up to the 40,000,000 to be put in by Weyerhaeuser & Rutledge. It will be noticed that it is contemplated in the contract as modified that the sawing will proceed from year to year until the whole amount of the timber is exhausted. The parties will be presumed to have understood whatever practical limitations there may have existed as to the ability of Weyerhaeuser & Rutledge to log more than 40,000,000 per year. While it may be said that it was expressly stipulated that the defendant should have the right to manufacture any excess over 35,-000,000 a year, yet such excess is in the first contract expressly confined to such amount as might be logged by Weyerhaeuser & Rutledge, and by no one else. When we come to the second contract, the same provision in respect to logging under any contract by Weyerhaeuser & Rutledge is by adoption carried over into that contract, and it is insisted on behalf of the defendant that, inasmuch as this provision in the first contract could apply only to the Weyerhaeuser & Rutledge logs, yet when it is carried over into the second contract it must be construed as applying to any action which might be taken by the defendant company in logging in excess of 35,000,000; and it is clear that any of the provisions of the first contract which related exclusively to Weyerhaeuser & Rutledge must be deemed to be carried over into the second contract; otherwise there would be no provision for the cutting and delivery of the additional timber. This is the difficult aspect of the matter, and needs careful consideration. The argument of counsel for defendant on this point is substantially this: No provision for the logging and delivery of the additional logs is written into the second contract. The manner of their cutting and delivery depends wholly on that clause in the second contract which adopts all the provisions of the first contract as modified as fully as if the additional logs were specifically mentioned in the last one. This, it is said, clearly

137 F.—20

shows that the references to the duty of Weyerhaeuser & Rutledge to cut and deliver the Weyerhaeuser logs under the first contract between these parties must apply to the duty of the Hines Company to cut and deliver the additional logs under the second contract, because, it is argued, some one must cut and deliver the latter, and, as Weyerhaeuser & Rutledge were under no obligation so to do, necessarily it is meant that the Hines Company must do so; and, it is further argued, if the Hines Company is thus, by such adopted and implied provisions, under duty to cut and deliver the additional logs, why can it not with equal propriety be said that the Hines Company may cut the excess and deliver it to its own mill? If one provision formally applying to Weyerhaueser & Rutledge really applies to the Hines company, why not the other? So that, when the second contract, by a provision adopted from the first, says that if, by any agreement with Weyerhaeuser & Rutledge, the Hines Company shall have more than 35,000,000 delivered in any year, it may itself manufacture such excess, it was really meant to drop the names of Weyerhaeuser & Rutledge, as logically impossible, and provide that the only person who could cut the additional logs should take the same place in respect to those logs occupied by Weyerhaeuser & Rutledge as to their logs. This argument would be very strong if the second Weyerhaeuser & Rutledge contract of November 13, 1900, had not existed when the second contract of February 19, 1902, was made. This contract provided that Weyerhaeuser & Rutledge should cut, haul, and deliver for the Hines Company about 100,000,000 of pine, spruce, and tamarack in the same towns referred to in the first contract, excepting six designated sections. In view of the existence of this contract, the language of the first Barker & Stewart contract as to cutting, delivery, and excess of the cut over 35,000,000 can be literally written into the modified contract without any logical break. The Weyerhaeuser & Rutledge obligation to cut and deliver logs had been by the 1900 contract extended to the additional logs, or at least a large part of them. Therefore there is no inconsistency in the literal adoption in the modified contract of language expressing that obligation, and applying such language to the additional logs.

I think this construction is also consistent with the general intention of the parties. This is, of course, the cardinal rule of construction, although I think the language is clear. Loud v. Pomona Land & W. Co., 153 U. S. 564, 14 Sup. Ct. 928, 38 L. Ed. 822. The construction contended for by defendant tends to render nugatory the contract as to the additional logs, giving defendant the option to take them out of the contract. This cannot be supposed to have been within the intention of both parties. It is also to be noted, as already indicated, that the parties, in agreeing that defendant might have any excess over 35,000,000 logged by Weyerhaeuser & Rutledge, probably had in mind practical limitations on their ability in that direction. They may have understood that it would be difficult for these loggers alone to greatly exceed the 40,000,000, and have been willing to agree that the Hines Company might saw

any excess logged by Weyerhaeuser & Rutledge, without being willing to consent that it might saw any excess cut by others. It will be noted here, and seems important, that the additional timber was in the same towns as the Weyerhaeuser & Rutledge timber, and was presumably accessible to the Weyerhaeuser & Rutledge railroad. Undoubtedly the plaintiff knew this, and may be presumed to have relied upon the whole situation, as bearing upon the ability of Weyerhaeuser & Rutledge to log any great amount in excess of 40,000,000 feet. To hold that the Hines Company had the right to supplement the amount of logging to be done by Weyerhaeuser & Rutledge by its own acts is to give the contract, as I think, an unreasonable construction—one not contemplated by the parties. I think the modified contract means to import into it the provision that Hines might procure Weyerhaeuser & Rutledge, but no one else, to do any additional logging over the 40,000,-000 per year, but I think the provision is confined to logging to be done by Weyerhaeuser & Rutledge under any contract between them and the Hines Company; and I think, also, as the additional timber introduced a very important element into the contract, that the plaintiff must be deemed to have relied upon this stipulation as greatly beneficial to it.

I do not think the tenth clause in the second contract in regard to winter sawing is significant, in view of the fact that logs cannot be taken from the boom in the water in the winter, but can only be delivered to the plaintiff over the Weyerhaeuser & Rutledge narrow-gauge railroad.

I think the act of the defendant in sawing the 71,000,000 out of the additional logs, no matter how bona fide, was a partial breach of the contract.

There was, then, if this reasoning be correct, a breach by defendant of the contract regarding the additional logs. By the voluntary act of defendant, due to a bona fide, but erroneous, construction of the contract, the additional logs were destroyed. This was not a renunciation or refusal to perform a contract provision still capable of performance. Such a refusal to do something still possible of execution is not itself a breach, but may or may not give the promisee the option to treat it as such. But the absolute destruction of part of the contractual subject-matter is a breach, ipso facto. The promisee has no option. Pro tanto the contract is at an end, whether the parties will or not. Whether it gives an immediate cause of action depends on whether performance by the other party has been prevented or excused. "We must, however, bear in mind, though every breach of the contractual obligation confers a right of action upon the injured party, every breach does not necessarily discharge him from doing what he has undertaken to do under the contract. The contract may be broken wholly or in part, and, if in part, the breach may or may not be sufficiently important to operate as a discharge, or, if it be so, the injured party may choose not to regard it as a breach, but may continue to carry out the contract; reserving to himself the right to bring action for such dam-

ages as he may have sustained by the breach. It is often very difficult to ascertain whether or no a breach of one of the terms of a contract discharges the party who suffers by the breach." Anson on Cont. 363. "If one voluntarily puts it out of his power to do what he has agreed, he breaks his contract, and is immediately liable to be sued, without demand, although the time specified for performance has not arrived." Bishop on Cont. § 1426; Wolf v. Marsh, 54 Cal. 228. "For partial derelictions and noncompliances in matters not necessarily of first importance to the accomplishment of the object of the contract, the party injured must still seek his remedy upon the stipulations of the contract itself." Selby v. Hutchinson, 9 Ill. 319; Weintz v. Hafner, 78 Ill. 27. These citations show that a breach existed, but do not settle the question whether part performance can be anticipated while actual performance is going on. These considerations in part distinguish this case from those cited on the argument. The rule of those cases, as I understand it, is this:

(1) A total breach by some act making performance impossible puts an end to the contract. Anvil Min. Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814; Lovell v. Life Ins. Co., 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 423; Canada v. Canada, 6 Cush. 15; Lee v. Briggs, 99 Mich. 487, 58 N. W. 477; Treat v. Hiles, 81 Wis. 280, 50 N. W. 896.

(2) The promisor may by his voluntary, wrongful act wholly and absolutely disable himself from performing a severable part of the contract. But such act is not intended to excuse performance of other parts of the contract, and does not go to the whole consideration, scope, or purpose of the contract, nor render unattainable its main object. If the promisee has performed his part of the contract to which such partial breach relates, he may sue at once. But if the time of performance of such part has not arrived, a performance of the balance is a condition of his right to demand performance of the part as to which such disability has occurred. He must await such time of performance before bringing suit, and must himself have performed up to that time.

(3) The promisor may, before the time for performance arrives, renounce the contract in part, performance of the whole being still possible. If the part so renounced be a dependent provision, or go to the whole consideration and scope of the contract, this is a breach. The other party may accept it as such, and sue at once for the difference between the contract price and the cost of performance. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Hochster v. De La Tour, 2 El. & Bl. 678; Lake Shore & M. S. Ry. v. Richards, 152 Ill. 59, 38 N. E. 773, 30 L. R. A. 33; Nilson v. Morse, 52 Wis. 240, 255, 9 N. W. 1; Pierce v. Tennessee Coal, Iron & R. Co., 173 U. S. 1, 19 Sup. Ct. 335, 43 L. Ed. 591; Standard Oil Co. v. Denton (Ky.) 70 S. W. 282; Tenn. & Coosa R. Co. v. Danforth, 112 Ala. 80, 20 South. 502; Walsh v. Myers, 92 Wis. 397, 66 N. W. 250; Allen v. Field (C. C. A.) 130 Fed. 654; Bolles v. Sachs, 37 Minn. 315, 33 N. W. 862; Cinn., Ind., St. L. & Chi. R. Co. v. Lutes,

112 Ind. 276, 11 N. E. 784, 14 N. E. 706; Cort v. Ambeogaite Ry. Co., 6 Eng. L. & E. 230; Fell v. Newberry, 106 Mich. 542, 64 N. W. 474; Haines v. Tucker, 50 N. H. 307; Lincoln v. Orthwein, 120 Fed. 880, 57 C. C. A. 540; New Bruns., etc., Co. v. Wheeler (C. C.) 12 Fed. 377. He may also defer suit until the time for performance arrives, and then sue, being ready to perform in the meantime, and leaving the promisor a locus penitentiæ, unless the former has so changed his position as to create an estoppel. Id. Where the contract requires manufacture, or the delivery of articles of merchandise, the manufacturer or vendor cannot insist on continued performance, unless the other party retracts his repudiation and accepts further performance, but must in any reasonable way minimize the damages suffered by him from such repudiation. Allen v. Field (C. C. A.) 130 Fed. 641; Clark v. Marsiglia, 1 Denio, 317, 43 Am. Dec. 670; Moline Scale Co. v. Beed,.52 Iowa, 307, 3 N. W. 96, 35 Am. Rep. 272; Black v. Woodrow, 39 Md. 194; Heaver v. Lanahan, 74 Md. 493, 22 Atl. 263; Gibbons v. Bente, 51 Minn. 499, 53 N. W. 756, 22 L. R. A. 80; Dillon v. Anderson, 43 N. Y. 231; Johnson v. Meeker, 96 N. Y. 93, 48 Am. Rep. 609; Heiser v. Mears, 120 N. C. 443, 27 S. E. 117; Davis v. Bronson, 2 N. D. 300, 50 N. W. 836, 16 L. R. A. 655, 33 Am. St. Rep. 783; Chicago, etc., Co. v. Barry (Tenn.) 52 S. W. 451; Tufts v. Lawrence, 77 Tex. 526, 14 S. W. 165; Danforth v. Walker, 37 Vt. 239; Id., 40 Vt. 257; Tufts v. Weinfeld, 88 Wis. 647, 60 N. W. 992; Collins v. Delaporte, 115 Mass. 159; Hosmer v. Wilson, 7 Mich. 294, 74 Am. Dec. 716; Nebraska City v. Nebraska City, etc., Co., 9 Neb. 339, 2 N. W. 870. Contra, Roebling's Sons v. Lock Stitch Fence Co., 130 Ill. 660, 22 N. E. 518.

(4) If the renunciation of part performance does not go to the whole consideration (full performance not being rendered impossible), and the renunciation was not intended to excuse performance of other provisions, and does not render unattainable the main object of the contract, no breach occurs, and no right of action arises. See Freeth v. Burr, L. R. 9 C. P. 213, and other cases cited in the same connection; Smoot's Case, 15 Wall. 36, 21 L. Ed. 107.

(5) Although renunciation goes to the whole contract, or to a vital, dependent provision, yet, if the other party does not promptly accept it as a breach, the contract is regarded as still alive for all purposes. Bernstein v. Meech, 130 N. Y. 358, 29 N. E. 255; Avery v. Bowden, 5 El. & B. 714; Weed v. Hoskins, Id. 729; Shields v. Carson, 102 Ill. App. 38; Rolling Mill v. Rhodes, 121 U. S. 255, 7 Sup. Ct. 882, 30 L. Ed. 920; Johnstone v. Milling, 16 Q. B. Div 460; Kilgore v. Northwestern, etc., Ass'n, 90 Tex. 142, 37 S. W. 600; Foss-Schneider Brew. Co. v. Bullock, 59 Fed. 83, 8 C. C. A. 14.

(6) An agreement to do something not going to the whole consideration, and not expressly made a condition, will be regarded as a "stipulation," a breach of which can be compensated in damages, and not as a condition precedent. Instances are afforded by agreements to submit disputes arising under a contract to arbitration. A refusal to arbitrate is not a condition precedent, unless

expressly made so, but the other party may sue for any damage caused by such refusal. Scott v. Avery, 5 H. L. Cas. 811. Where a singer, among other agreements, was to report for rehearsals six days before the performances were to commence, but reported only two days before, this was a stipulation to be compensated in damages, not a condition precedent. Bettini v. Gye, L. R. 1 Q. B. D. 183; Andrew v. Chapple, L. R. 1 C. P. 643; Pickens v. Bozell, 11 Ind. 275; Boyle v. Guysinger, 12 Ind. 273.

The present case is sui generis, so far as direct authority goes. It is the breach of an independent promise, by destruction of part of the subject-matter, making further performance quoad hoc entirely impossible, but not giving plaintiff the right to abandon performance of the balance. This appears to me entirely demonstrable. Defendant's act in sawing the additional logs was professedly in performance of the contract as understood by it. No default or breach was intended. Defendant was, as it insisted and now insists, simply availing itself of an express stipulation of the contract. Nothing was done or apparently contemplated or intended to interfere with performance in other respects. The continued sawing of the Weyerhaeuser & Rutledge logs was at all times insisted on, the payment therefor punctually continued, and is still going on. No breach was intended. "The true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract." Freeth v. Burr, L. R. 9 C. P. 213, quoted with approval in Hoffman v. King, 70 Wis. 372, 378, 36 N. W. 25. In the latter case the rule laid down by Lord Mansfield in Jones v. Barkley, 2 Doug. 691, is approved, to the effect that the dependence or independence of covenants depends upon the order of time in which the intent of the transaction requires their performance. In the case here defendant was not required to deliver the additional timber for sawing until the Weyerhaeuser & Rutledge logs were exhausted; hence its failure to deliver them prior to 1907, if they had remained in existence, could not have justified plaintiff in repudiating the whole contract. Nor was the agreement to deliver the additional logs a condition precedent to either the building of the mill or the sawing of the Weyerhaeuser & Rutledge logs. The destruction of the additional logs did not go to the entire substance of the contract, and to the whole consideration, within the rule of Milldam Foundry v. Hovey, 21 Pick. 417, also quoted with approval in the Hoffman Case, or render unattainable the object of the contract, within Selby v. Hutchinson, 9 Ill. 319; Weintz v. Hafner, 78 Ill. 27. See, also, the leading case of Johnstone v. Milling, 16 Q. B. D. 460, cited and relied on by defendant's counsel, where it was held that a lessor's covenant to rebuild did not go to the whole consideration, and that a refusal to rebuild would not justify lessee in declaring a total breach; also Kerslake v. McInnis, 113 Wis. 659, 666, 89 N. W. 895, holding that the failure to cut 400 M of logs out of a larger amount was not a condition precedent. Kaukauna Water Co. v. Kaukauna, 114 Wis. 327, 89 N. W. 542.

I think, therefore, that the obligation to deliver the additional logs

was an independent one, the breach of which did not authorize plaintiff to stop sawing the other logs. If the act of defendant did not prevent performance of the contract as a whole, and such performance would be necessary to enable plaintiff to be in a position to finally saw the additional logs, then a cause of action would not arise before the time of performance arrives.

The question still remains whether the partial breach which has been found to exist in this case can be regarded as anticipating the time when an action for such breach can be brought. Every breach must give rise to a cause of action, but should the latter be deemed to arise until performance is due, especially in a case where performance of the major part of the contract is proceeding? This question has not arisen in any decided case, so far as I have been able to find, nor is it discussed by any text-writer, except to some extent by Prof. Williston in an article on Repudiation of Contracts in 14 Harv. Law Rev. 421, 428. The plaintiff has not fully performed all it is bound to do under the contract; hence it cannot be said that the time will ever come when a cause of action for the destruction of the additional logs will arise, and it is clear that such condition precedent has not been in any way dispensed with by the defendant. So it cannot be affirmed that plaintiff ever will have a right of action. The breach does not go to the full scope and consideration of the contract. So the condition of full performance by the plaintiff has not been excused. In order that an action can be maintained as for a breach, it must appear that performance by the plaintiff has in some way been excused by defendant. It seems clear that a breach falling short of a ground of rescission does not operate as such excuse. The agreements of the contract in question are not mutually dependent, in the sense that the destruction of the logs operated or was intended as a repudiation of the whole contract, but are so dependent in the sense that plaintiff must perform continuously in order to keep the contract alive, and justify an action for any breach; and, defendant not having excused such performance, no cause of action has yet arisen.

The supervening circumstances possible in this case are the destruction of the mill by fire, and a failure to rebuild within three months. The plaintiff's lease may expire, without renewal, before the time of performance arrives, or some default amounting to repudiation may occur, accepted as a breach by defendant. What effect these circumstances might have upon a default previously existing on defendant's part, it is not now necessary to decide. It is argued that any one of them would be material, although the additional logs had been cut long before. That question is not now presented.

Even when the repudiation is so serious as to lead to rescission and a consequent action for profits, many difficulties beset the proofs, as shown by Allen v. Field (C. C. A.) 130 Fed. 641. But how much more troublesome is the case where performance is going on, as here, up to and beyond the full present obligations of the parties, and where the time of actual performance as to the additional logs may

not be reached for several years. An action for a present breach under such circumstances may profoundly affect such continued performance. The defendant may also be deprived, in an action immediately brought, of the proper force and effect of all supervening circumstances either lessening or defeating liability. On the other hand, the plaintiff's damages may be so far projected into the future as to be immensely difficult of estimation. Continued performance, and whether it is efficient or otherwise, is also likely to improperly influence the measure of damages. In short, the estimation of profits under such circumstances is so difficult and burdensome, and attended with so many anomalous conditions, that the remedy given as upon anticipatory breach of a contract should not be extended to such a case as this unless plainly required by legal principle. There are anomalies and difficulties enough in the ordinary case of repudiation followed by a complete rescission, but these are greatly increased in a case like this, brought for a partial breach long before performance is due, at the same time that full performance of all other parts of the contract is going on.

For my part, I am unwilling to extend a legal rule attended by such difficulty to a case of partial breach, even where the subject-matter has been, as here, partially destroyed by the defendant, especially when performance by the plaintiff has not been excused or dispensed with. The main reason for the application of the rule of anticipatory breach is its practical convenience. 14 Harv. L. R. 438. When this ceases I think the rule itself should not be applied.

The motion to direct a verdict for defendant on the first cause of action is granted, without prejudice to the right of the plaintiff to sue when a cause of action shall arise.